FURNESS, WITHY & CO., Limited, v. LOUIS MULLER & CO.

(District Court D. Maryland. March 29, 1916.)

SHIPPING ⬯52—CHARTERS—BREACH.

The charterer of a steamship for carrying a cargo of wheat from Baltimore to one of a number of European ports, in August, 1914, *held* not justified in refusing to load the vessel because of the war; it appearing that none of the named ports was blockaded, and that other vessels carried cargoes safely at about the same time.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 211–213; Dec. Dig. ⬯52.]

In Admiralty. Suit by Furness, Withy & Co., Limited, a corporation, against Louis Muller & Co., a corporation. Decree for libelant.

Whitelock, Deming & Kemp and John B. Deming, all of Baltimore, Md., for libelant.

Venable, Baetjer & Howard and Charles McHenry Howard, all of Baltimore, Md., for respondent.

ROSE, District Judge. The libelant, Furness, Withy & Co., Limited, is a British corporation. It seeks damages for the breach of a contract to furnish a cargo to one of its ships and to pay the agreed freight thereon. It will be called the owner. The respondent, Louis Muller & Co., is also a body corporate, organized under the laws of this state. It will be called the charterer.

The charter was made in May, 1914. By it the owner undertook to put at charterer's command at Baltimore, some time between the 5th and 25th of August, 1914, a steamer to carry 32,500 quarters of grain to that one of the six ports, Avonmouth, London, Antwerp, Rotterdam, Havre, or Dunkirk, which the charterer should name at the time of the signing of the bills of lading. If it designated either Havre or Dunkirk, it was to pay extra freight at the rate of 4½d. a quarter. On the 7th of August the owner tendered the steamship Kelbergan to the charterer. Its lay days began at 7 a. m. on the 8th and ended on

the 14th, on which last-named day the charterer told the master that it would not furnish the cargo. It is admitted that the owner did everything it was called upon to do.

The defense is that the outbreak of the European war made performance impossible, or at all events so changed the conditions existing at the time the charter was made as to justify either party in treating it as at an end. What made performance impossible? There was plenty of grain in Baltimore. It was wanted on the other side. The ship was ready to take it. The trouble was twofold. The charterer did not wish to ship without insuring the cargo against war risks. During the first two weeks of August, 1914, such insurance was hard to get, and could be obtained, if at all, only at rates which seemed then unreasonable, and which later events have demonstrated to have been so.

The other consideration which gave the charterer pause was it could not get pay for its grain in the way in which it and all other American grain exporters had been wont to get it. When the grain was stowed on the vessel and the bills of lading for it signed, it was the custom to attach them, with insurance policies and other necessary or convenient shipping documents, to a draft upon the European consignees, and to sell the drafts to bankers in this country. The war closed the market for such paper. The European buyers were not, at short notice, able to arrange to make payment on this side. The charterer and other persons in like line of business did not want to ship their grain and take the chance of having it paid for when it reached the other side, and many, if not most, of them had not the capital to do so, even if they had the disposition.

Nevertheless some grain was shipped from Baltimore to Antwerp in the first two weeks of August, and from and after August 15th such shipments were many and large. None of the ports to which the charterer had the right to send the grain were blockaded. The traffic was as legal in August as it had been in May. It is true that the charterer, by no fault of its own, found in its way many difficulties which had not been foreseen when the charter was made. These difficulties do not appear, however, to have been of a character which would excuse performance. Carnegie Steel Company v. United States, 240 U. S. 156, 36 Sup. Ct. 342, 60 L. Ed. ——.

How much was the owner damaged? It lost the difference between the freight it would have received and what it would have had to pay out to earn it, less any other net earnings the ship actually made in the time which would otherwise have been occupied in discharging her charter obligations. In dollars and cents much depends on the port to which the charterer would have sent the ship. The charterer says that the owner's recovery cannot exceed the net profit the latter would have made had it been required to discharge at the port most costly to itself. The owner's view is that the damages should be calculated upon the assumption that the cargo would have been sent to the port which the court shall find the charterer would have chosen had it selected any. It is unnecessary to decide which is right. The charterer says, if it had been able to make arrangements to ship at all, it would have sent the ship to Havre. I believe it. That is the port which would

have been most expensive to the shipowner. It is true that the freight to Havre would have been greater than to any of the ports in England or the Low Countries named in the charter. Nevertheless the port charges and cost of unloading would also have been heavier, and, more important than all, the length of time during which the ship would have been detained would have been much greater. To unload at Havre, even in ordinary times, is a much slower process than at Rotterdam. In the conditions which prevailed there in early September of 1914—that is, just before, during, and immediately after the battle of the Marne—the delays would have been far more serious than under other circumstances. I am satisfied that, if the ship had taken the cargo to Havre, at least 41 days would have elapsed between the beginning of the lay days at Baltimore and the earliest date on which it could have entered upon another venture. Every day of this time in a sense counts double. It not only increases the cost to the ship of performing the original contract, but swells the portion of her net earnings under a new charter, which must be applied to a reduction of the first charterer's liability.

When the latter finally announced its refusal to perform, the owner sought a new charter, and three days later obtained one to carry coal from Norfolk to Rio. On the 11th of September, when the ship was within 500 miles of the latter port, it was stopped by the British cruiser Bristol. Its captain and crew were taken off and sent to Rio. The ship itself was put in charge of a prize master, and it was not until 45 days later, on October 26th, that it was again delivered to its own captain at the Brazilian capital. This prolongation of the voyage greatly reduced its average daily earnings, which nevertheless still remain substantial. The account between the owner and the charterer may be summarized as follows:

Freight, if the full cargo of grain had been sent to Havre.........$20,201.62
Cost of earning it............................................... 13,632.24

Net earnings, if charter voyage had been made...................$ 6,569.38
From which deduct the daily net earnings under the substituted charter, for the time during which the ship was earning money thereunder, but would, if the charterer had furnished the cargo, been engaged in earning the charter freight......................... 5,666.71

Leaving net loss to owner.................................$   902.67

For the last-named sum the owner must have a decree.