## DET FORENEDE DAMPSKIBS-SELSKAB AKTIESELKAB v. C. F. & G. W. EDDY, Inc.

(District Court, D. Massachusetts. October 15, 1923.)

No. 1389.

1. **Shipping** ⊛⊃37—**Correspondence held to constitute completed contract of charter.**

Telegrams and letters exchanged between the parties *held* to constitute a contract of charter of a steamship, and not as preliminary to the making of a formal charter party, especially in view of their subsequent acts in treating it as a completed contract.

2. **Contracts** ⊛⊃170(1)—**Practical construction by parties is evidence of their intention.**

Where the construction of letters is involved with other testimony, and the intention of the parties is brought in question, the court has the right to look to the construction which the parties place on their action.

3. **Shipping** ⊛⊃52—**Refusal of charterer to load because of war conditions held breach of charter.**

The charterer of a steamship for carrying a cargo of grain from Boston to Copenhagen and Swedish ports *held* not justified in refusing to load the ship when tendered August 17, 1914, because of war conditions in Europe, or unless the owner would give positive assurance that the

ship would sail as soon as loaded, which would deprive it of the benefit of exceptions in the form of bills of lading agreed upon, and such refusal *held* a breach of the contract.

**4. Shipping ☞51—Demand for demurrage not due held not breach of charter.**

Demand by the owner for demurrage from the charterer, when demurrage was not due, *held* not a breach of the charter, nor a waiver of subsequent breach by the charterer.

In Admiralty. Suit by Det Forenede Dampskibs-Selskab Aktieselkab against C. F. & G. W. Eddy, Inc. Decree for libelant.

G. Philip Wardner, of Boston, Mass., for libelant.

Warner, Stackpole & Bradlee, of Boston, Mass., for respondent.

HALE, District Judge. This is a libel by a shipowner, a Danish corporation, against a shipper, a Massachusetts corporation, for failure to load. The libel alleges that on July 22, 1914, the respondent made a contract in writing with the libelant to load on the steamship Kentucky at Hoosac Tunnel Docks, Boston, eight or ten loads of heavy grain for Ahus or Trelleborg, in the kingdom of Sweden, at respondent's option, at two shillings three pence per quarter of 480 pounds, and balance of steamship requirements for Copenhagen at one shilling nine pence per quarter of 480 pounds, the option for Ahus or Trelleborg to be declared when the bills of lading were signed, and Copenhagen to be the first port of discharge. No claim is now made for demurrage. The libelant pleads a breach of the contract, and seeks to recover the difference between the freight it would have received and what it would have had to pay to earn it, less any other net earnings the ship actually made in the time which would otherwise have been occupied in discharging her charter obligations.

The respondent says that no contract was ever made; that the negotiations were merely preliminary to a contract. It further says that, if there was a binding contract, there was no breach of it by the respondent, and that the ship was withdrawn by the libelant before the expiration of the time in which the respondent was entitled to load.

In the latter part of July, 1914, certain letters, telegrams, and telephone messages passed between the parties, which the libelant relies upon as constituting a contract for the shipment of grain by the respondent on the Kentucky in August, 1914.

[1] 1. The correspondence between the parties relating to the making of the alleged contract was as follows:

On July 21, 1914, respondent telegraphed to the libelant's agents, Funch-Edye & Co.:

"Will take Kentucky 8 to 10 loads Ahus and Trelleborg our option 2 shillings balance Copy 1 shilling and 9 pence our option rotation wire answer."

On the same day Funch-Edye & Co. cabled:

"Kentucky are cabling Copenhagen to-night will reply to-morrow."

On July 22, Funch-Edye telegraphed respondent:

"Provided Trelleborg last port will accept for Kentucky from Boston 8 to 10 loads quantity your option 2/3 balance Copenhagen 1/9 usual Baltimore berth form canceling if not ready August 31st steamer left Newcastle yesterday for Boston."

On the same day respondent wired Funch-Edye & Co.:

"If agreeable give option of Trelleborg or Ahus as bid."

Funch-Edye replied on the same day:

"Kentucky cable does not give authority Ahus, but if necessary to carry trade through we will run risk always understood Copenhagen first port of discharge."

Thereafter on the same day, respondent wired Funch-Edye & Co.:

"Will accept Kentucky 1/9 Copy our option sending steamer to either Ahus or Trelleborg at 2/3 quantity to be 8 to 10 loads if exercise this option and Copy first port of discharge."

To this libelant replied by telegram on the same day:

"Kentucky we cannot agree to Copenhagen only. If you wish to charter steamer please let us know at once and port of discharge either Ahus or Trelleborg must be declared upon signing bill of lading and understood Copenhagen must be first port of discharge."

To this the respondent replied by telegram the same day:

"All right we accept Kentucky with option Ahus or Thelleborg but agree to send steamer to one or other balance Copenhagen."

And thereafter on the same day respondent wired Funch-Edye & Co.:

"How many loads Kentucky carry?"

And in a further telegram the same day:

"We confirm having closed Kentucky to load at Boston 8 to 10 loads heavy grain your option Ahus or Trelleborg at 2/3 balance Copenhagen at 1/9 understood Copenhagen to be first port of discharge you to decide whether steamer is to go to Ahus or Trelleborg upon signing bills lading we estimate steamer will hold about 19 loads of grain."

On the same day the respondent wired:

"Understand Kentucky discharge according to customs port."

On the same day Funch-Edye & Co. telegraphed the respondent:

"Kentucky booking is berth engagement on Scandinavian-American line bill of lading will be used which stipulates that grain is to be discharged as fast as steamer can deliver and if required by ship owners both day and night Sundays and holidays which we trust is satisfactory."

On July 22d respondent wrote Funch-Edye & Co. the following letter:

"Boston, July 22nd, 1914.

"Messrs, Funch-Edye & Co., New York, N. Y.—Gentlemen: We confirm having booked with you to-day, S. S. Kentucky, now on the way here from Newcastle, to load at Hoosac Docks, Boston, 8 to 10 loads of heavy grain for Ahus or Trelleborg, at our option, 2/3 per quarter of 480 lbs., the balance of the steamer's requirements for Copenhagen at 1/9 per quarter of 480 lbs. The option of Ahus or Trelleborg to be declared when the bills of lading are signed. Copenhagen to be the first port of discharge.

"Should the steamer not be ready by Aug. 31st we have the option of cancelling the contract.

"This is our contract No. 4338.

"As to the manner of discharge, we have to say that on berth term charters it is customary for the steamer to insert in bill of lading, and we may say

we have never known agents to refuse to stamp the clause on the bill of lading, the following clause: 'Receivers of cargo are in no case obliged to take delivery at night without their consent, and in any event the steamer must bear all extra expenses incurred by working at night.' Please write us that you agree to this clause being stamped on the bills of lading.

"Yours very truly,                               C. F. & G. W. Eddy, Inc."

On the following day, A. C. Lombard's Sons, the local agents of libelants in Boston, wrote the respondent as follows:

"July 23, 1914.

"C. F. & G. W. Eddy, Inc., Boston—Gentlemen: We beg to confirm ocean freight room engagement made with your good selves on yesterday by Messrs. Funch-Edye & Co., New York, covering 8 to 10 loads heavy grain, your option as to quantity, to be shipped to Trelleborg or Ahus, your option, at 2/3 per quarter of 480 lbs., and the balance of grain requirements of S. S. Kentucky to Copenhagen at 1/9 per quarter of 480 lbs.

"This engagement is made with the express understanding that steamer is to make Ahus or Trelleborg the last port of call, and the booking is made as a berth line one and will be governed by conditions contained in the regular Scandinavian-American line bill of lading. The Kentucky is reported to have sailed from Newcastle on the 21st for Boston, which will make her due with us about the 4th or 5th of August, and the above-mentioned bookings were made for shipment by this steamer.

"Yours very truly,                          A. C. Lombard's Sons."

I think that the letter of July 22d, taken in connection with the preceding telegrams, must be held to have completed a contract substantially as is pleaded in the libel. The minds of the parties seem to have met in agreement that the ship was to load in Boston at the Hoosac Docks; that there were to be two ports of destination, Copenhagen first, and then Ahus or Trelleborg, at the respondent's option; that such option was to be declared when the bills of lading were signed. The cargo was to be grain; eight to ten loads, at the respondent's option, were to be for Ahus or Trelleborg, and the balance for Copenhagen. The rate was to be one shilling and nine pence per quarter of 480 pounds to Copenhagen, and two shillings and three pence per quarter for Ahus or Trelleborg. The balance of the cargo for Copenhagen was to be the difference between the amount specified by the respondent for Ahus or Trelleborg and the whole number of loads which the steamer would take. The method of booking appears to have been agreed upon.

The whole correspondence tends to induce the belief that no other charter party was looked for by the parties, but that they intended the correspondence to constitute the contract.

The respondent urges that the minds of the parties did not meet because, first, the loading was to be at Hoosac Docks, whereas, in the former letters, Boston had been referred to as the place of loading; second, that the letter introduces a new element in speaking of the steamer's requirements; third, that the respondent was to have the option to cancel if steamer was not ready by August 21st; fourth, that the bill of lading was to have in it a clause protecting against delivery at night without shipper's consent; and, in any event, all extra expense was to be borne by the steamer.

It will be seen that Funch-Edye & Co., in their telegram of July 22d, had "closed" the Kentucky to load at Boston. In the letter of July 22d the respondent confirmed having booked the Kentucky to load

at Hoosac Docks. The ship's agreement to load may be assumed to have given the charterer the right to have her load at any customary place in Boston. If the respondent had agreed "to load at Boston," it would still have had the right to require the vessel to load at the Hoosac Docks, as that was a customary place of loading for export grain in the port of Boston. The respondent points out that, in its letter of July 22d, it stated that it had booked the balance of steamer's requirements for Copenhagen, whereas, in a letter written by Lombard, the local agent of the libelant, the expression "balance of grain requirement" is used. This must be interpreted in the light of the previous correspondence, where the expression "balance" and "balance of cargo" was used. I think the "balance of ship's requirements" clearly meant that the respondent was to load the ship entirely, and load it with grain; this had been the only cargo ever talked about between the parties. The respondent also urges that, in its letter of July 22d, it stated:

"Should steamer not be ready by August 31st, we to have the option of canceling contract."

And Funch-Edye & Co. have used, in former correspondence, the expression:

"Usual Baltimore berth form canceling if not ready August 31st."

I can see no inconsistency in the two expressions. The steamer sailed for Boston July 21st. She was to arrive in Boston August 4th or 5th. Her actual date of arrival was August 7th. Clearly the libelant could not have meant that it was to have the right to cancel if the cargo was not ready by August 31st and that the respondent would have until that time to get its cargo ready. It could not have intended that it would let its vessel lie idle from August 5th to August 31st. It is clear that the expressions used refer to the berth form charter, and the proofs show that the Baltimore and Boston berth form charter party are the same, so far as the question involved is concerned.

The matter raised in the latter part of the letter of July 22d, with reference to the manner of discharge, seems to me to be a request, made after the terms of the contract had been agreed upon; that this request was met by the subsequent telephone communication of Ryan, acting for the libelant. Ryan testifies that George Eddy asked, over the telephone, if the particular clause referred to in the letter would be agreed to, and that Ryan told him it would. The conversation is denied by respondent; but the subsequent action of parties convinces me that Ryan told the truth. I cannot sustain the contention of the learned counsel for the libelant that the letters looked forward to the completion of the contract in the shape of bills of lading. Bills of lading could only be made after loading, and it seems clear to me that an actual agreement amounting to a charter party was made by the correspondence. The proofs indicate that the berth term charter was to be used, which contains explicit provisions as to loading, and as to the bill of lading, which would be issued upon completion of loading.

Whether a contract is completed by letters, or the letters are merely incidental to the making of a future contract, is often a difficult ques-

tion. In Mississippi & Dominion Steamship Co. v. Swift, 86 Me. 248, 29 Atl. 1063, 41 Am. St. Rep. 545, the Maine court held that the question was one of intent. In speaking for the court, Mr. Justice Emery—afterwards Mr. Chief Justice Emery—pointed out that among the circumstances which were determining was whether the negotiations themselves indicated that a written draft was to be contemplated, as a conclusion of the contract, and that, if a written contract is proposed or referred to during the negotiations, it is some evidence that the parties intended a formal contract to be made. It appears in testimony, in the case at bar, that, with grain shipments from New York to Europe, bookings made by telegram and letter were more customary than formal charter parties. The negotiations themselves induce the belief that a formal written charter party was not contemplated, and was never mentioned, but that the parties intended their letters and telegrams to constitute their contract. The proofs show that the libelant prepared and equipped the Kentucky for a grain cargo, got a certificate from the surveyor of the New York Board of Underwriters, sent it to the respondent, and held the vessel at the respondent's disposal from August 15th to August 24th; that the respondent procured the grain and had it available in time for loading. Clearly, then, the parties acted on the basis of a completed contract.

[2] It is true that where an instrument has been prepared with contractual intent, or where the evidence consists entirely of writings, the written words absolutely govern, and it is held that the personal or individual intention of the parties have nothing to do with the construction of the contract. Pope v. Bibb Mfg. Co. (C. C. A.) 290 Fed. 586; Neer v. Lang, 252 Fed. 575, 164 C. C. A. 491; Hughes v. Dundee Mortgage Co., 140 U. S. 98, 104, 11 Sup. Ct. 727, 35 L. Ed. 354. But where the construction of letters is involved with other testimony, and where the intentions of the parties is brought in question, the court has a right to look to the construction which the parties place upon their action. American Lumber, etc., Co. v. Atlantic Mill & Lumber Co. (C. C. A.) 290 Fed. 632, 634; McKell v. Chesapeake & O. Ry. Co., 175 Fed. 321, 328, 99 C. C. A. 109, 20 Ann. Cas. 1097. In the Swift Case, supra, the Maine court had before it a question of whether the contract was completed by letters, and decided it by a consideration of the intention of the parties.

In the case at bar the letters, taken in connection with the whole testimony, lead me to believe that on July 22d the minds of the parties met on the same terms, in the same sense, an agreement was thus made, constituting a substantial charter party, and that this agreement covered the entire arrangement, except as to the details of loading and transportation.

[3] 2. Was the contract broken by the respondent?

On August 7th the Kentucky arrived in Boston. On August 15th the Lombards wrote the respondent, advising it that the ship was ready to receive the grain under respondent's freight room engagement, and was awaiting delivery of the same by respondent. The Lombards further stated that the ship was ready to carry out her part of the contract, and inclosed a certificate of a New York Board of Underwriters

that the vessel had been fitted up and equipped in every way to load grain. Replying to the letter of August 17th, the respondent wrote the Lombards, inquiring whether they proposed to insert in the Kentucky bills of lading what was known as the "war clause," or in any other way add to or change their customary bill of lading. On the same day, the Lombards wrote the respondent:

"As stated over the telephone to Mr. George W. Eddy, there will be no unusual condition or changes made in the regulation of the Scandinavian-American line bills of lading, other, of course, than a clause to cover voyage and destination."

Lombards further said that the ship was awaiting the delivery of the grain, and inclosed a bill for demurrage from 7 a. m. August 17th to 7 a. m., August 18th. On August 18th Lombard sent respondent a bill for demurrage for August 18th and 19th. The same day the respondent acknowledged the receipt of Lombard's letter of the 18th and asked for a "copy of the clause which you propose to insert in the Kentucky's bills of lading."

On August 19th Lombards replied that they—

"had no instructions to place any unusual clause in the bills of lading covering the grain you book for shipment for Kentucky, and we will only insert the name of the port after you have declared your option."

The Lombards also inclosed bills for demurrage to date, saying:

"You must appreciate the vessel cannot be held at your disposal pending your making your arrangements with your various correspondents, or for other reasons of your own, without being reimbursed for loss of time."

On August 20th the Lombards wrote the respondent as follows:

"Boston, Mass., 20th August, 1914.

"Messrs. C. F. & G. W. Eddy, Incorporated, Boston—Dear Sirs: Referring to our recent interchange of correspondence in regard to your supplying the Danish S. S. Kentucky with cargo, in accordance with recent contract made by you with us and also our telephonic conversations of to-day.

"We beg to advise your good selves, unless you will begin loading the cargo which was contracted by you for the ship on to-morrow, the 21st instant, she will be withdrawn then and fixed for other business.

"We also beg to notify you that you will be held responsible for all losses and/or damages and/or demurrage which the ship may sustain by reason of your failing to fulfill your contract.

"You will also please understand that you will not participate in any way with the profits which the ship may make by reason of her withdrawal.

"We trust, therefore, you will see your way clear to pay the demurrage which has accrued or may accrue to the ship, and will then proceed with the loading of cargo in accordance with contract.

"Very truly yours,          A. C. Lombard's Sons, Agents."

On August 21st Lombards sent a bill for demurrage up to 7 a. m., and asked for settlement; and on the same date the respondent wrote Lombard's as follows:

"Boston, Aug. 21, 1914.

"Messrs. A. C. Lombard's Sons, State Street, Boston, Mass.—Gentlemen: You have never given us a positive assurance that S. S. Kentucky would sail as soon as she were loaded, in case we delivered the grain which we booked; your answer being always that she would sail, except for stress of circumstances. In view of present conditions, we should say that such stress of circumstances already exists, for not only is the North Sea declared

by the British Admiralty to be mined, but the approach to Copenhagen also is reported mined. Such conditions to our minds make it unsafe to ship, so we feel that we are well within our rights in demanding, before ordering out the wheat, that you give us a positive answer to our question: Will the S. S. Kentucky, without regard to war conditions, sail as soon as loaded, in case we give her the wheat?

"Yours truly,                                  C. F. & G. W. Eddy, Inc."

On the same day Lombards replied as follows:

"Boston, 21st August, 1914.

"Messrs. C. F. & G. W. Eddy, Incorporated, Boston—Dear Sirs: Replying to your favor of even date:

"As previously informed you, it is the intention of the S. S. Kentucky to proceed to sea when vessel has received her cargo, and we see no reason why she should not do so; but there is no condition in any grain contract we have ever made giving a guaranty unconditionally that ship would sail immediately she was loaded.

"The contract you made with us is a customary one, and there is no reason why any unusual guarantees should be made in connection with the same, and as already informed you, the Kentucky has been ready to carry out her terms of the contract made, but you have failed to deliver the grain.

"Under the circumstances, unless you see your way to abide by the contract made with steamer, we can only refer you to our letter of yesterday, which gave you the attitude of the ship in regard to the contract.

"Yours very truly,                         A. C. Lombard's Sons,
                                        "Agents, S. S. Kentucky and Owners."

To this letter the respondent replied:

"Boston, Aug. 20, 1914.

"Messrs. A. C. Lombard's Sons, State Street, Boston, Mass.—Gentlemen: Your second letter of the 21st received this afternoon. You must recognize that, with nearly all Europe at war, the situation is somewhat different than usual. We consider that we have a perfect right to ask you to state in writing that the Kentucky would sail as soon as she received her cargo, without regard to conditions abroad in consequence of the war.

"The fact that this is not an ordinary request does not enter into the matter, as these are extraordinary times. Quite a few vessels have been obliged to return to port and discharge grain after it was loaded, and the conditions prevailing in the North Sea and the vicinity of Copenhagen at present time do not by any means encourage us to feel certain that you will be able to sail the Kentucky when loaded. We asked you to give us this written statement before you tendered the steamer, and you have been unwilling to do so. We can, therefore, only conclude that you are not reasonably sure that the steamer will sail when loaded; and, this being the case, we are unwilling to load the grain in Kentucky with the German and English fleets at any moment likely to come into conflict and prevent steamer sailing and reaching ports of destination.

"Yours truly,
"GWE.                                         C. F. & G. W. Eddy, Inc."

Clearly this letter was written August 21st, and it antedates Lombard's second letter of the 21st. On the same date the respondent wired Funch-Edye & Co.:

"Reference Kentucky. In our opinion we are not obliged to ship because of the war. Steamship agents have taken this position and have canceled contracts right and left. Moreover although we have asked for it Messrs. Lombard's have never given us a positive assurance that the steamer would sail if we loaded her. Their answer being always that she would sail except under stress of circumstances. We could not be expected to load under such circumstances. Furthermore, the North American Grain Association have been advised that the North Sea is mined and that it would be unsafe for

shippers to ship without prejudice to our position. If you will give us positive assurance that the steamer will sail as soon as loaded and will waive demurrage, which in view of existing conditions it is most unreasonable to ask us to pay, we will load the ship. To hold out for a few days demurrage under such extraordinary conditions is most unreasonable and would seriously prejudice further business. In a time like this you ought to assist rather than obstruct.

. "August 21st, 1914.                                                  Eddy."

Funch-Edye replied on the same date:

"C. F. & G. W. Eddy, Boston. Reference Kentucky we do not think it advisable we should interfere at this juncture and would refer you to Lombards with whom your contract has been made.        Funch-Edye & Co."

On August 22d, the Lombards sent respondent a bill for demurrage up to 7 a. m. of that date, and asked for remittance; and, on the same date, Funch-Edye & Co., acknowledged the respondent's letter of August 21st as follows:

"We beg to own receipt of your favor of yesterday's date, and beg reference to telephonic communication with your Mr. Eddy to-day, and exceedingly regret that we did not feel justified in the withdrawal of the claim for demurrage incurred by you on the S. S. Kentucky.
        "Very truly yours,
"WEW/E.        Funch-Edye & Co."

On Monday, August 24th, respondent wrote Funch-Edye as follows:

"Boston, Aug. 24, 1914.
"Messrs. Funch, Edye & Co., 8 Bridge Street, New York, N. Y.—Gentlemen: Yours of the 22d received.
"In our telephone conversation on Saturday you will recall that writer referred to the fact that mines in the North Sea have been reported as a menace to navigation by the British Admiralty, and that there was attendant risk and danger in ships going to Copenhagen. For this reason we felt that we were justified in asking you to give us guaranty that the steamer would sail when loaded since something might happen in the meantime to cause you to change your mind about the sailing. We feel that we are justified in asking for this guaranty under the circumstances as present almost universal war in Europe seemed to be a sufficient menace to steamers sailing, especially to Copenhagen to warrant our request. This would seem to be justified by the fact that we now learn that two of your steamers have been sunk by striking floating mines within the past few days. We feel that this proves beyond question that our request is a reasonable one, even though you may be prepared to take further risk by sailing your steamers, which, however, would not alter the case, as we could not foresee what your position might be after such a catastrophe.
        "Yours truly,
"GWE.        C. F. & G. W. Eddy, Inc."

On August 24th Lombards wrote to the respondent as follows:

"Boston, 24th August, 1914.
"Messrs. C. F. & G. W. Eddy, Inc., Boston—Gentlemen: Referring to your ocean freight room contract made through Messrs. Funch-Edye & Co., New York, under date 22d July last, covering certain shipments of grain to be made per S. S. Kentucky to Copenhagen and Ahus or Trelleborg, about which we have been in correspondence:
"The S. S. Kentucky, as advised you under date 15th inst., was then prepared to receive the cargo as booked and carry out the ship's terms of contract, but, up to date, you have not delivered the grain as required by said freight room contract.

."Under the circumstances we have withdrawn ship from the tender made to you, from this time and date, and will seek other employment for ship, and the present will serve to notify you that all demurrage, dead freight, and other expenses and conditions arising out of your nonfulfillment of contract will be for your account, and vessel will take necessary steps to reimburse herself because of your action in the matter.

"Very truly yours,                       A. C. Lombard's Sons,
"Agents Danish S. S. Kentucky and Owners."

On August 25th Funch-Edye & Company replied to the respondent's letter of August 24th as follows:

"We are in receipt of your favor of yesterday's date, contents of which are noted.

"We have no confirmation of the loss of the steamers Maryland and Chr. Broberg, but understand these steamers, if lost, had come through the English Channel, the former from the Plate, and without probably any information as to the existing political conditions. As the steamers from here of the Scandinavian-American Line go north of Scotland they are not subject to such danger, and we can only say that our steamers, which have left here for Copenhagen since the trouble, have reached their destination safely, and also steamers coming from abroad have arrived here on schedule time."

Whether or not the above letters, together with other testimony in the case, show a breach of the contract on the part of the respondent, is a question presenting some difficulty. The respondent says that it never broke the contract. Its learned counsel contends that they are entitled to a reasonable length of time in which to load the ship after its tender; that the whole civilized world was in a state of uncertainty, threatened with convulsions such as had never been heard of before, with the United States and every belligerent warning against mines in the line of the proposed voyage, with all the uncertainties natural to the incident of a world war; that, under these circumstances, it is not reasonable to be supposed that business would proceed with the same dispatch as in normal times; that, under these circumstances, respondent insisted upon assurances that the ship would actually sail when loaded, and that a "war clause" would not be required, making it incumbent upon the respondent to pay heavy insurance before sailing.

Respondent relies upon The Styria, 186 U. S. 1, 9, 22 Sup. Ct. 731, 46 L. Ed. 1027, in which the Supreme Court held that, where war broke out after the cargo had been loaded and bills of lading had been issued, the reasonable expectation of danger to the cargo from war perils made it not unreasonable to unload and store the cargo; that the question of good faith and reasonable delay must be considered and determined, in the light of facts, in each particular case. Balfour, etc., Co. v. Portland, etc., Co. (D. C.) 167 Fed. 1010; Hansen v. American Trading Co., 208 Fed. 884, 126 C. C. A. 44; The Kronprinzessin Cecilie, 238 Fed. 668, 151 C. C. A. 518.

In the case before me, respondent urges that it was justified in asking for reasonable delay to see whether the ship would sail under its contract, or whether it would be held up by the captain, and it says that, before a reasonable time had expired, the ship was withdrawn.

The libelant takes the ground that the respondent had no right to ask for an assurance or guaranty that the ship was to sail under its contract.

It is pointed out that under their contract, including their Baltimore berth term charter, the ship would be excused from canceling if prevented by any of the clauses enumerated in the charter; that the respondent had no right to ask for any further guaranties than were contained in its contract, and that above all it had no right to ask for a modification of the contract; that what the respondent was asking the libelant could not give without waiving its right to insist on the exception in the contract. It is urged that the libelant's agent gave notice that it was the intention of the Kentucky to proceed to sea when the vessel had received her cargo; and that this assurance was sufficient.

In Carnegie Steel Co. v. United States, 240 U. S. 156, 36 Sup. Ct. 342, 60 L. Ed. 576, the Supreme Court held ability to perform a contract is of its essence; delay resulting from absence of such ability is not due to unavoidable causes, such as fires, storms, labor strikes, etc., as enumerated in the contract involved in that case; and the fact that a contractor, engaged to deliver armor plate of specified qualifications as to thickness and hardness, was delayed by unforeseen difficulties in the then new art of manufacturing, does not excuse performance, if such delays were not within the excepted reasons for delay. In Furness Withy & Co. v. Muller, 232 Fed. 186, 187, Judge Rose, of the District Court, placed his decision largely upon the Carnegie Steel Co. Case, and held that the charterer of a steamship for carrying a cargo of wheat from Baltimore to one of a number of European ports in August, 1914, was not justified in refusing to load the vessel, because of the war; it appearing that none of the named ports was blockaded, and that other vessels carried cargo safely at about the same time. The court said:

"The defense is that the outbreak of the European war made performance impossible, or at all events so changed the conditions existing at the time the charter was made as to justify either party in treating it as at an end. What made performance impossible? There was plenty of grain in Baltimore. It was wanted on the other side. The ship was ready to take it. The trouble was twofold. The charterer did not wish to ship without insuring the cargo against war risks. During the first two weeks of August, 1914, such insurance was hard to get, and could be obtained, if at all, only at rates which seemed then unreasonable, and which later events have demonstrated to have been so.

"The other consideration which gave the charterer pause was it could not get pay for its grain in the way in which it and all other American grain exporters had been wont to get it. When the grain was stowed on the vessel and the bills of lading for it signed, it was the custom to attach them, with insurance policies and other necessary or convenient shipping documents, to a draft upon the European consignees, and to sell the drafts to bankers in this country. The war closed the market for such paper. The European buyers were not, at short notice, able to arrange to make payment on this side. The charterer and other persons in like line of business did not want to ship their grain and take the chance of having it paid for when it reached the other side, and many, if not most, of them had not the capital to do so, even if they had the disposition.

Nevertheless some grain was shipped from Baltimore to Antwerp in the first two weeks of August, and from and after August 15th such shipments were many and large. None of the ports to which the charterer had the right to send the grain were blockaded. The traffic was as legal in August as it had been in May. It is true that the charterer, by no fault of its own, found in

its way many difficulties which had not been foreseen when the charter was made. These difficulties do not appear, however, to have been of a character which would excuse performance."

In Luckenbach S. S. Co., Inc., et al. v. W. R. Grace & Co., Inc., 267 Fed. 676, the Circuit Court of Appeals for the Fourth Circuit held that a contract between two domestic corporations for the carriage of cargoes of nitrates from South American ports to domestic ports was not terminated by the declaration of war with Germany, although thereafter its performance was subject to greater hazards.

In the case at bar, the respondent, in its letter of August 31st, to the Lombards, stated that they had a right to ask that Funch-Edye & Co. give an assurance that the Kentucky would sail as soon as she received her cargo, and that Funch-Edye & Co. had not given such assurance, and concludes:

"This being the case, we are unwilling to load the grain in the Kentucky."

The respondent telegraphed to Funch-Edye & Co. on the same date, saying:

"If you will give us positive assurance that the steamer will sail as soon as loaded, and without demurrage, we will load the ship."

I think the conditions attached to this refusal were without justification, and that the contract had fixed the rights of the libelant as to sailing when loaded, and it could not then be stated whether demurrage would ultimately be due or not; that the respondent had no right to demand of the libelant that it waive, at that time, all claim to demurrage, or that it would guarantee anything as to the vessel's sailing further than provided in the contract. Under the Baltimore berth term charter, the ship would be excused from sailing if prevented by any of the clauses enumerated in the charter. The respondent, then, was asking the libelant for a modification of the contract which the libelant could not give without waiving its right to insist upon the exceptions in the contract.

I think the expression of unwillingness to load was something more than a mere expression that the respondent was loath to load; that this statement, together with the other correspondence, and with the acts of the respondent, must be held to be a repudiation of the contract and a breach of it.

In The Styria, to which I have referred, the Austrian ship had taken on a cargo of sulphur in an Italian port destined to an American port; it unloaded the cargo on the outbreak of the war between the United States and Spain; it was held justified in doing so, because the cargo was contraband, and was liable to seizure by Spanish cruisers, particularly when passing Spanish ports. The case at bar presents a wholly different question from this.

In The Kronprinzessin Cecilie, already cited, the decision was based on the fact that war was imminent, and if it had broken out before the German vessel arrived at her destination she would have been violating the law of Germany in entering belligerent ports, and would herself have been liable to seizure, and her German passengers would have been liable to detention. The case at bar is wholly different from that

case. So far as I can find, no case in the books gives the court an exact rule for this case. I think, however, that the Carnegie Steel Co. Case, 240 U. S. 156, 36 Sup. Ct. 342, 60 L. Ed. 576, with the cases based upon it, is of some value as a precedent.

The thing agreed upon in the case before me was clearly possible and lawful; the difficulty or improbability of accomplishing the undertaking does not avail the respondent. I am not satisfied that the conditions justified the respondent in basing his conduct upon a fear that the libelant would not sail the Kentucky when loaded. It cannot be said that a party to a contract is justified in breaking the contract because be is afraid that the other party will break it. The libelant urges that the respondent was, in fact, seeking time for decision whether it would actually load or not, when the ship was in position for loading, and notice had been given that she was in such position, ready to receive grain, and waiting for the delivery of it. Some of the evidence tends to show this; but I am not called upon to decide this question.

[4] The fact that demurrage was demanded by the libelant at a time, when it is found not to have had a right to make such a demand, clearly does not make a breach of the contract by the libelant or any waiver, on the part of the libelant, of the respondent's breach.

On the last lay day the agent of the libelant notified the respondent that the Kentucy had been prepared to receive and carry out the terms of the ship's contract, and, after reciting further facts, the letter proceeds:

"Under the circumstances we have withdrawn the ship from this time and date, and will seek other employment for the ship."

I am constrained to hold that the respondent had definitely repudiated its contract by the letter of August 21st, and, at the close of the lay days, the libelant had a right to withdraw the ship.

After a careful examination of the letters and the other testimony in the case, I conclude that the respondent made a breach of the contract. The case must go to an assessor, and, on the coming in of his report, this court will take such further action as is found necessary. Albert T. Gould, Esq., is appointed assessor.