**DOWLIN et al. v. BOYD et al.    (No. 11465.)**

(Court of Civil Appeals of Texas. Fort Worth. March 20, 1926. Rehearing Denied May 8, 1926.)

**1. Abatement and revival ⬅︎52—Causes of action enforceable by personal action in form ex delicto did not survive death of either sole plaintiff or sole defendant at common law.**

At common law, causes of action enforceable by personal actions in form ex delicto did not survive death of either sole plaintiff or sole defendant.

**2. Executors and administrators ⬅︎3(5)—Insane lessor's cause of action, based on fraud and deceit, held not to survive to heirs, who did not allege there was no necessity for administration of his estate.**

Insane lessor's cause of action, based on fraud and deceit of defendants in obtaining lease, held to survive, if at all, to his personal representative and not his heirs, where they alleged that he died intestate, and that there had been no administration, but failed to allege that there was no necessity therefor.

**3. Insane persons ⬅︎73—Executory contract of insane person is not binding.**

Executory contract of insane person is not binding, and may be avoided so long as it is wholly executory, notwithstanding good faith of the other party.

**4. Insane persons ⬅︎61—Lease by insane person prior to adjudication of insanity, on adequate consideration, and made by lessee in good faith, will be upheld, in suit by lessor's heirs to recover difference between amount paid by defendant and reasonable market value of lease.**

Lease made by insane person before any adjudication of insanity, on adequate consideration of which he had benefit, and made by lessee in good faith and without knowledge of insanity or reason to suspect it, will be upheld, in suit by lessor's heirs to recover difference between amount paid by defendant and reasonable market value of lease.

**5. Pleading ⬅︎46.**

Failure to allege legal capacity to sue held to make petition subject to general demurrer.

**6. Insane persons ⬅︎61.**

Evidence held to sustain directed verdict for defendant, accused of fraud in inducing insane person to execute oil lease.

**7. Fraud ⬅︎50.**

Burden of proof as to defendant's participation in fraud was on plaintiffs, suing for damages from fraud.

**8. Evidence ⬅︎268—Statements of deceased insane lessor to sister that "they have done the best they could for me" held inadmissible, in action for fraud to show undue influence.**

Evidence of statements of deceased insane lessor to sister that "they have done the best they could for me" held inadmissible, in action for fraud in securing lease to show undue influence.

Appeal from District Court, Wichita County; H. R. Wilson, Judge.

Suit by Mrs. Martha A. Dowlin and others against J. F. Boyd and another. Judgment for defendants, and plaintiffs appeal. Affirmed.

Taylor & Taylor, J. L. Lackey, and H. M. Muse, all of Wichita Falls, for appellants.

BUCK, J. Mrs. Martha A. Dowlin, J. M. Creed, Mrs. Nancy Cecil, joined by her husband, Mrs. E. A. Wynne, joined by her husband, Mrs. Edna Wright, joined by her husband, Mrs. Minnie Nail, joined by her husband, Willie Jackson, Mrs. Samuel Manuel, a feme sole, Mrs. Maggie Powell, Carroll Jackson, John Jackson, Robert Jackson, and Mrs. Amie Alley, joined by her husband, sued J. F. Boyd and J. S. Owens, alleging that the plaintiffs were all heirs at law of David Jack-

son, who departed this life on or about February 21, 1924, and that they were all the heirs of said David Jackson, except Mrs. Mary Forbus, who did not join in the suit. They alleged that as such heirs the plaintiffs were entitled to inherit and did inherit fifteen-sixteenths of all the property owned by the said David Jackson at the time of his death, and were entitled to recover damages of defendants by reason of the facts hereinafter set out.

Plaintiffs alleged that as a result of the mental condition in which David Jackson was at the time of his death, and for many years prior thereto, he departed this life intestate, and that there had been no administration on his said estate.

Plaintiffs further alleged that prior to his death said David Jackson became insane and mentally unbalanced and unsound, and that he was adjudged insane in the county court of Wichita county, and confined in an asylum until he died; that he had been insane and feeble in mind and body and mentally unable to take care of his business for many years prior to his death.

It was further alleged that plaintiff Mrs. Martha A. Dowlin sometimes tried to assist and advise the said David Jackson in his business matters, and that the defendant Boyd, for many years prior to the death of David Jackson and prior to the transactions alleged in the petition, advised the said David Jackson and assisted him in his business matters, and that the said David Jackson intrusted his business affairs and property rights and interests to the said Boyd, and that the said Boyd was the confidential adviser of the said David Jackson, and that Jackson had great confidence and trust in the said Boyd, and as a result thereof, considering the mental condition of the said David Jackson, that a confidential relation existed between the said Boyd and the said David Jackson; that said Jackson was at the time of his death seized and possessed of a tract of land in Wichita county consisting of 180 acres.

Plaintiffs further alleged that on or about October 19, 1919, in and around Iowa Park, Wichita county, and adjacent to the land owned by David Jackson, there was considerable activity in oil; that there was located in this vicinity what was known as the K. M. A. field, situated near the lands owned by Jackson; that said Boyd knew of the feeble condition of body and mind of said Jackson, and that he was insane and incompetent to look after his business affairs and transact business, and that said Jackson had great confidence in Boyd and believed that he would look after his business and would fully protect the said Jackson in his property rights; that the defendant J. S. Owens, on or about October 19, 1919, in company with a man by the name of Apple, went to the home of said

Jackson, where he and his sister, Mrs. Martha A. Dowlin, resided, and applied to the said David Jackson for a lease on the 180 acres of land for oil and gas and mineral purposes; that said Jackson informed said Owens that he would not lease the land to any one until he talked with defendant Boyd; that the next day Owens and Boyd both visited the home of Jackson with a view of inducing Jackson to lease them all of the land of Jackson, and that said Jackson advised them that he did not want to lease said land, and that he had been offered $250 an acre by Sam Kemp just a few days before that time and had refused to lease the said land; that said Owens and Boyd, acting and conspiring together, represented to the said David Jackson that the lease on said acreage was not worth $250 an acre or anything like that amount, and informed Jackson that the K. M. A. well was dry, and concealed from him the fact that said well was a producer, although they both well knew the fact that such statements made to him were untrue; that the day following they induced said Jackson to execute and deliver to them, or at least to one of them, an oil and gas lease on said land for $75 an acre.

It was further alleged that, by reason of his feebleness of mind and body and insanity, said Jackson did not know the value of said lease; that he was induced to make the lease at the price of $75 an acre by reason of the statements made to him by and in the presence of defendant Boyd; that said Jackson would not have made the lease at the price above mentioned if he had not been insane and feeble in mind and body and had not relied on the statements of Boyd, and his willingness and ability to advise Jackson for his best interest; that soon after said Jackson was declared insane Boyd was appointed the guardian of the estate of said Jackson, and knowing that said lease, executed to the said Owens and himself, was a void lease and could be canceled because of the mental condition of Jackson, said Boyd, in furtherance of said scheme and plan to defraud the said Jackson and these plaintiffs out of said property, executed an oil and gas lease to said land, as guardian, to his codefendant, Owens, to whom the first lease was made; and that the reason and purpose of the said Boyd in making said lease as guardian was to make a lease that was valid, and to put it beyond the power of the said Jackson and these plaintiffs to cancel said lease and get in possession of said property, which properly belonged to them.

It was further alleged that the value of the lease to the property at the time of the execution of the contract of lease to Owens was of the reasonable market value of $1,000 per acre. The petition further alleged that, as soon as plaintiffs discovered the fraud hereinbefore mentioned and practiced on said

Jackson, they brought this suit. They prayed for damages in the sum of $180,000.

Defendants answered by way of a general demurrer and certain special exceptions and a general denial. They admitted that David Jackson before his death became insane and was mentally adjudged insane, but alleged that the execution of the lease was four months prior thereto, and especially denied that at the time of the execution of the lease in question said Jackson was feeble minded or was not able to transact his business for himself, and especially denied that said Boyd had looked after, managed, or had anything to do with the affairs of said Jackson during the year 1919, and prior to his appointment as guardian of said Jackson, or that the said Boyd ever held himself out to the said Jackson as his legal adviser or business adviser concerning the management and handling of his business, and especially pleaded that said Jackson was during the said year, and especially during the month of October, 1919, very capable and competent of transacting his own business, managing his own affairs, looking after his farm and various rentals and business matters connected therewith without any assistance or advice from defendant Boyd. They specially denied that on or about October 19, 1919, there was any oil being produced near said land, and denied that said land was adjacent to any oil well that was being drilled on said date, and further denied that said Jackson's land was adjacent to what was commonly known as the K. M. A. oil field, and specially pleaded that said land was approximately 1½ miles from the original Kemp-Munger-Allen well, which was drilled during the year 1919. They specially pleaded that, so far as the defendants knew or were informed at the time of the lease, there was no oil being produced within 7 or 8 miles of said land, and specially denied that they knew that said Jackson was feeble in mind or body, or that they knew that his mental condition was such as to keep him from looking after his business or properly protecting the same, and denied that they knew that said Jackson was placing confidence in said Boyd in so far, if at all, as his business was concerned.

Defendant further pleaded that, after defendant Owens and Earl Apple went to see Jackson about leasing his land, Jackson declined to close the contract or execute any papers, on the ground that the day was Sunday, but requested Owens to come back to his place the next day, and that he would close the deal for said lease. Owens specially denied that he was informed by the said Jackson that he (Jackson) wished to talk with defendant Boyd before he would make any lease, and specially denied that defendant Boyd was ever mentioned at any time during the conversation on the above date. Defendant Owens further pleaded that, pursuant to the agreement and request of the said Jackson, he got into his car at Iowa Park on Monday morning of October 20, 1919, and started back to see Jackson about said lease, and that, as he was passing through the business part of the town, he saw the defendant Boyd and requested him to take a ride with him down to the well that was being drilled, known as the K. M. A. well; that the said Boyd complied with said request and went with Owens to near where said well was being drilled; that they were not permitted to go to said well, as the owners and drillers had guards stationed at some distance therefrom, and they were not able to get any information with reference to said well further than that the drill bit had penetrated a sand which was thought to contain oil, but was making salt water at the time; that upon leaving the premises near said well they drove to the said Jackson's home, and thereupon the said David Jackson came out to the car where the defendants were, and the defendant Owens and Jackson began the discussion of said lease that was mentioned the preceding day; that the said Jackson declined to make said lease and these defendants started their car, and were preparing to leave when the said Jackson then said that he would accept the terms offered by the said Owens and agreed verbally to make said lease, whereupon Owens executed and delivered to the said Jackson his check for the sum of $1,000 in part payment for said lease; that said Boyd did not advise or in any way influence the said Jackson, or have anything whatsoever to do with said trade; that he was really an innocent bystander, and had no interest whatsoever in said deal one way or the other; and the defendants specially denied that the said Jackson talked with the said Boyd with reference to said lease or solicited his opinion with reference thereto in any manner that indicated that he was relying upon the said Boyd whatsoever in making said trade. Defendants specially denied that they informed said Jackson or any one else that the K. M. A. well had come in as a dry hole, but alleged that they specifically stated to him that they did not know the condition of said well, nor did they believe any one else could tell whether it would make a producing well or not; that on the following day Jackson came to Iowa Park, without being induced so to do, or without being sent for, as alleged by plaintiffs, and entered into a contract with Owens for the sale of said lease on the 180 acres; that upon said last-named date said Boyd did not see Jackson until after the lease had been executed. They further pleaded that on the occasion when they met in Iowa Park said Jackson refused to accept an offer of $75 an acre, for said lease, and that he and defendant Owens made another and new contract with reference thereto, wherein it was agreed that the

said Owens would pay to ·the said Jackson the sum of $75 per acre cash, upon the delivery of said lease, and $25 per acre in addition, provided the K. M. A. well came in as a producing well, making as much as 500 barrels per day for a period of 60 days.

The pleadings of both parties are very voluminous; the plaintiffs' petition covering 32 pages of the transcript, and the defendants' answer covering some 18 pages, but we believe we have stated substantially the contentions of both parties.

The cause was tried before a jury on special issues, and the jury found: (1) That at the time said David Jackson executed and acknowledged the oil and gas lease on the 180 acres of land he was of unsound mind; (2) that said J. S. Owens did not make any material misrepresentations to Jackson as to the condition of the K. M. A. well prior to the execution of the oil and gas lease on the 180 acres; (3) that said David Jackson did not know at the time of the execution of the lease and the acceptance of the money in payment therefor of the condition of the K. M. A. well; (4) that the reasonable market value per acre of the oil and gas lease upon the 180 acres on October 21, 1919, was $250 per acre. The court instructed the jury to find for the defendant Boyd, and on the answers of the jury to the special issues submitted gave judgment for defendant Owens. The plaintiffs have appealed.

### Opinion.

The first questions for us to decide are: (1) Does the cause of action which Jackson may have had against the defendants, or either of them, survive said Jackson's death? (2) Does the fact that the plaintiffs failed to allege, in addition to the allegation that Jackson died intestate, that there was no administration on the estate and no necessity therefor, make the petition subject to a general demurrer where plaintiffs are suing alone as heirs of said Jackson?

[1] It is conceded by appellees and appellants that, under the common law adopted by this state, unless otherwise changed by statute, that every personal action in form ex delicto abates on the death of either the sole plaintiff, or the sole defendant, before verdict and judgment; and this is still the law, except in so far as the common law rule has been modified by statute. See 1 Corpus Juris, § 248, p. 153. At common law the principle of most general application in regard to the survival and abatement of causes of action is that those enforceable by personal actions, in form ex delicto, do not survive. 1 Corpus Juris, § 193, p. 174. Again, on page 174, it is said:

"The true line of demarcation at common law separating those causes of action which survive from those which do not is that in the first the wrong complained of affects primarily and principally property and property rights, and the injuries to the person are merely incidental, while in the latter the injury complained of is to the person, and the property and rights of property affected are merely incidental. In the former case the cause of action survives, while in the latter it abates."

It may be further conceded that the common law has not been changed by statute in this state with reference to the abatement or survival of causes of action founded in fraud and deceit, where the injured party dies before suit is filed. Appellants cite such cases as Williams v. Harris (Tex. Civ. App.) 193 S. W. 403; Williams v. Adams (Tex. Civ. App.) 193 S. W. 404; T. & N. O. Ry. Co. v. Smith, 35 Tex. Civ. App. 351, 80 S. W. 247; Stringfellow v. Early, 15 Tex. Civ. App. 597, 40 S. W. 871; Kloepfer v. Forch, 32 Idaho, 415, 184 P. 477, by the ·Supreme Court of Idaho, as sustaining the contention that any cause of action that David Jackson had against either or both of the defendants survived his death and vested in his heirs. ,In the Idaho case above cited, the cause of action accrued out of the purchase of an amount of sodium arsenate, represented by the vendor to be sodium arsenite, and the application thereto to crops, which were destroyed thereby. The Supreme Court of Idaho held that, in fact, the cause of action was on the implied or expressed covenant of the seller that the mineral purchased was in fact sodium arsenite, a suitable poison to be used in compounding a spray for his crops for the purpose of destroying insect pests, and that, in the absence of a statute providing otherwise, causes of action ex contractu survive, while causes ex delicto do not. That the true test is not so much as to the form of the cause of action as to the nature of the cause of action. Where the cause of action is a tort unconnected with contract, and which affects the person only, and not the estate, such as assault, libel, slander, and the like, there the rule "Actio personalis moritur cum persona," applies. But where, as in that case, the action is founded on a contract, it is virtually ex contractu, although nominally in tort and survives the death of either the plaintiff or the defendant. The court cites the cases of Lee's Administrator v. Hill, 87 Va. 497, 12 S. E. 1052, 24 Am. St. Rep. 666; Booth v. Northrop, 27 Conn. 325; Cutter v. Hamlen, 147 Mass. 471, 18 N. E. 397, 1 L. R. A. 429; and other cases.

In Williams v. Harris, supra, writ of error refused by the Commission of Judges, the Texarkana Court of Civil Appeals, speaking through Judge Levy, says:

"The appellant contends that the suit against the testator, St. Clair, abated by reason of his death, and the court erred in not so holding, because the cause of action was one purely for tort, which, by the common law, did not survive the death of the tort-feasor. It is believed that the court did not err in the ruling complained

of, for the action is one for damages for the wrongful acquisition of specific property by reason of fraud and deceit. The personal actions which at common law die with the person are causes of action where the damages are personal in nature, as, for instance, anguish of mind, injury to character, deprivation of liberty, and bodily injury. Feary v. Hamilton, 140 Ind. 45, 39 N. E. 516; Gibbs v. Belcher, 30 Tex. 79; Railway Co. v. Goodman, 20 Tex. Civ. App. 109, 48 S. W. 778; Stebbins v. Palmer, 1 Pick. (Mass.) 71, 11 Am. Dec. 146; Watson v.. Loop, 12 Tex. 11. But, where the damages sustained affect property rights or interest therein, the right of action survives against the executor or administrator. 1 Corpus Juris, p. 185 ; 1 Cyc. p. 49; 1 R. C. L. p. 28; Railway Co. v. Smith, 35 Tex. Civ. App. 351, 80 S. W. 247. As stated in Re Payne's Appeal, 65 Conn. 407, 32 A. at page 952, 33 L. R. A. 418, 48 Am. St. Rep. 215:

" 'The principle involved is: In the case of a tort directly resulting in the wrongful acquisition of property, the law imposes on the wrongdoer the duty of returning that property to the owner. This duty may be treated as a quasi contract, and the neglect to perform it may become a breach of such contract. In such case, the damage resulting from the tort is substantially the value of the property, and the damage resulting from the breach of contract is substantially measured in the same way; and so, for determining the question of survival, the substantial cause of action may properly be treated as founded in contract, although the form of action might sound in tort. But such principle cannot apply unless property is acquired.' "

Every case cited by appellants in support of their contention on this point involves the taking of some specific property, or the deprivation of some property right, or the enforcement of some contractual obligation, or cases where the survival of the right of action is based on a statute, etc., and we have found no case holding that where the cause of action is one based entirely on fraud and deceit, and there is no prayer for a rescission of the contract in which the fraud and deceit was alleged to have been practiced, and where, as in this case, the parties defendant returned to the injured party, or to his heirs, the property acquired under the contract, that such cause of action survive.

Counsel for appellee stated, in oral argument, that the evidence showed that Owens drilled a well on the Jackson land and, it proving a dry hole, returned the land relieved of the lease, either to Jackson or to his heirs, or to his guardian.

In Borchert v. Borchert et ux., 132 Wis. 593, 113 N. W. 35, by the Supreme Court of Wisconsin, the court said:

"It may be stated * * * that when the property of· a person is wrongfully obtained by another and retained by him wrongfully either in specie or in its converted form, or to his enrichment, a cause of action to redress the wrong accrues to such person against such other, which is assignable and which survives by the rule of the common law.

"A mere fraud or cheat by which one sustains a pecuniary loss is not a deprivation of the property of one to the enrichment of another and so does not give rise to a cause of action which survives by the rule of the common law, or by our statutory extension thereof, to causes of action for ·'damages * * * to personal estate,' but a right to recover in some form on account of property wrongfully obtained and detained or converted survives to the personal representative of the wronged person by the rule of the common law. Kinsey v. Heyward, 1 Cowp. 375; Woods Adm'r v. Howell, 17 Ga. 495. That is extended to the ordinary remedies by our statute. Section 4253, St. 1898.

"The right to sue for the rescission of a contract secured through fraud and to recover property obtained under such contract, or the proceeds thereof, survives, on principle, as the authorities abundantly show. Coon v. Dennis, 111 Mich. 450, 69 N. W. 666; Sharon v. Terry (C. C.) 36 F. 337, 1 L. R. A. 572. The following language from the opinion in the first case cited seems to fully. cover the question in hand:

" 'Undue influence is recognized by all authorities as a species of fraud, and fraud, inducing a transfer of personal property or a chose in action, renders such transfer voidable, and one of the remedies of the party defrauded, or his executors is a rescission of the transfer.' "

See, also, Jenks v. Hoag, 179 Mass. 583, 61 N. E. 221, by the Supreme Court of Massachusetts; Purcell v. Purcell, 233 Mass. 62, 123 N. E. 394; Moran v. Beson, 225 Mich. 144, 195 N. W. 688; Columbian National Life Ins. Co. v. Lemmons, 96 Okl. 228, 222 P. 255. See Booth v. Coward, 265 S. W. 1026, by our Commission of Appeals, to show this case is a personal action.

The writer has written to the American Law Book Company, publishers of Corpus Juris, and to West Publishing Company, asking their aid in furnishing authorities, either pro or con, on this question, but they have been unable to find any, though they have furnished us with a list of authorities on the general subject of abatement. At least a majority of the court are unwilling, in the absence of competent authority, to sustain the conclusion that the cause of action here stated did not survive. In 1 R. C. L., under the subject of Abatement and Revival, p. 45, § 43, it is said:

"As already seen the maxim, 'Action personalis moritur cum persona,' does not apply to cases of which courts of equity take cognizance, and it follows that a suit in equity for fraud does not die with the person of the defendant. Moreover, even at common law a cause of action for deceit in the sale of personal property, by which it was rendered less beneficial to the purchaser, survives his death. But an action of damages for fraud of the defendant in inducing the plaintiff to marry and cohabit with him, by means of false and fraudulent representations, is for injury to the person, and does not survive either at common law, or under a statute providing for the survival of a cause

of action for wrong done to the property, rights or interest of another for which an action might be maintained against the wrongdoer. If a woman, having a lawful husband living, represents to another man, in ignorance of this fact, that she is single, and thereby induces him to assume and maintain toward her the status of husband, the deception is an injury to him complete with the consummation of the void marriage, and gives him a right of action against her for any pecuniary loss sustained by the fraud. But the cause of action, being founded wholly on a private wrong, does not survive against her legal representatives, where she acquired no property by her tort, though she did derive a benefit."

But this authority does not determine the question here involved, and, for the reasons already given, we are unwilling to affirm the judgment on the ground that the cause of action, if any, against the defendants, died with David Jackson.

[2] But any cause of action, by reason of the alleged deceit and fraud of the defendants, would survive, if at all, to the personal representatives of the estate; that is, to the administrator or executor of the estate of said Jackson and not to his heirs, unless the heirs allege and prove that there was no administration on his estate and no necessity therefor. The petition merely alleges that Jackson died intestate, and that there had been no administration on the estate, but did not allege that there was no necessity therefor.

[3, 4] Upon the majority holding of the present day that the contracts of an insane person, made prior to an adjudication of insanity, are merely voidable, see 14 R. C. L. § 38, p. 528; 32 Corpus Juris, pp. 727, 733, and 734; Jones v. Meyer (Tex. Civ. App.) 248 S. W. 777, modified by Supreme Court in Donaldson v. Meyer, 261 S. W. 369. The executory contract of an insane person is not binding and may be avoided so long as it is wholly executory, notwithstanding the good faith of the other party. But where a contract has been fully executed, and the contract is merely voidable, not void, there is a conflict of authority. The weight of authority is that, where there has been no inquisition or adjudication of insanity, a contract entire, upon an adequate consideration of which the insane person has had the benefit, and made by the other party in good faith, without fraud or undue influence, and without knowledge of the insanity or reason to suspect it, will be upheld. 32 Corpus Juris, p. 734, § 570; Jones v. Meyer, supra. We think the findings of the jury in this case sustain the necessary facts and conditions set forth in the rule above quoted from the weight of authority.

[5] The failure to allege a legal capacity to sue is held in some Code states, and by reason of statutes, to make the petition subject to a general demurrer. 31 Cyc. pp. 295, 296, and cases there cited. In Texas we have

284 S.W.—41

followed this rule. Webster v. Willis, 56 Tex. 469. In Richardson v. Vaughan, 86 Tex. 93, 23 S. W. 640, in an opinion by Judge Gaines, our Supreme Court said:

"The trial court held that the plaintiffs were not entitled to maintain the action, and dismissed the suit. This judgment was affirmed by the Court of Civil Appeals.

"Since our statute casts the legal title of property belonging to the estate of deceased persons directly upon the heirs (subject, however, to the payment of debts), we think it might properly have been held that, after the lapse of a reasonable time without administration upon the estate, they should have the right to sue for the recovery of any chose in action or other property which had descended to them. But from an early day a different doctrine has been announced in the court, and it is now too late to depart from it. As a general rule, the holding has been, that the heirs cannot sue without alleging and proving that there is no administration upon the estates, and that there is no necessity for one.

"In Walker v. Abercrombie, 61 Tex. 69, an exception was recognized. There three years had elapsed since the death of the ancestor and no administration upon his estate had been applied for. The estate was alleged to be insolvent, and it appeared that the debt which was sought to be recovered was about to be barred by limitation. It would seem that, where a suit is necessary to preserve the property, the right of the heirs to bring it ought to be maintained, especially where a considerable time has elapsed without administration. Creditors, who have not seen proper to attempt the collection of their claims through the probate court, are not likely to suffer any injury in such a case by permitting the heirs to sue."

This rule has been followed consistently by our courts. Laas v. Seidel, 28 Tex. Civ. App. 140, 66 S. W. 871, 68 S. W. 724, affirmed by the Supreme Court in 95 Tex. 442, 67 S. W. 1015, on certified question; Faulkner v. Reed, 241 S. W. 1002, by Commission of Appeals; Johnson et ux. v. Union Nat. Bank (Tex. Civ. App.) 242 S. W. 293; Simmons et al. v. Campbell (Tex. Civ. App.) 213 S. W. 338; Modern Woodmen of America v. Yanowsky (Tex. Civ. App.) 187 S. W. 728. Therefore, by reason of defective pleading, which failed to allege a cause of action, there is another reason for affirming the trial court's judgment.

[6] Propositions 1 to 6, inclusive, assail the action of the trial court in directing a verdict for the defendant Boyd. It is alleged that the evidence was sufficient to sustain the conclusion that the defendant Boyd willfully failed to impart to Jackson, on the occasion of the visit to Jackson's home by Owens and Boyd, his knowledge of the condition of the K. M. A. well. The evidence failed to show that Boyd had any interest in securing the lease in question. Mr. Reese Allen testified that he was drilling the K. M. A. well, and on October 20, 1919, Mr. Owens and Mr. Boyd drove up to the fence inclosing the derrick where

the well was being drilled; that the witness told Owens in the presence of Boyd that the company had a good gamble and it looked like they would get a well; that they had discovered a sand and had salt water; that he thought he told them also that he had struck oil. Defendant Owens testified that he went over to the Jackson home on October 19, 1919, which was Sunday, and had a talk with Jackson with reference to leasing his land; that Jackson thought the lease was worth $100 an acre, while the witness did not think he could pay more than $75; that Jackson told him he would not trade on Sunday, but that, if he would come back on Monday, he would talk further about it; that as he drove through Iowa Park the next day he saw Boyd, and asked him if he wanted to go with him to see the new well; that Boyd got in the car with him and they drove out to the well and talked with Allen; that Allen told him that he had some sand and was making some oil, but that the well was making salt water, and he couldn't tell whether it would make a well or not; that after talking with Allen they drove to the Jackson home and Jackson still insisted on $100 an acre; that as they drove off Jackson agreed to take $75 an acre, and he signed a check to Jackson for $1,000, to bind the trade; that on the next day Jackson came into Iowa Park and they had Mr. Corridon to fix up the lease; that Jackson and he had a discussion at that time with reference to the price to be paid, Jackson thinking he was not getting enough for the lease, and he agreed to give him $25 an acre more. This agreement seems to have been based on the condition that the K. M. A. well should produce 500 barrels per day for 60 days. No witness said that Boyd advised Jackson to make the lease, or expressed to him any opinion that such action would be advisable. Boyd testified that Jackson asked him what he thought about the lease and he told him that he did not know whether it would be a good lease or a bad lease, and that was the only conversation they had regarding the lease.

[7] The burden of proof of Boyd's participation in the alleged fraud was on the plaintiff, and we do not think that the testimony contains any evidence showing that Boyd was guilty of any fraud in the transaction leading up to the execution of the lease, or that he withheld knowledge in his possession which in good conscience he should have disclosed to Jackson. The burden of proof is on the party who alleges fraud. As shown by our Supreme Court in Joske v. Irvine, 91 Tex. 574, 44 S. W. 1059:

"The broad and wise policy of the law, formed in and descending to us through the crucibles of time, does not permit the citizen to be deprived of his property, his liberty, or his life upon mere surmise or suspicion, and places upon a trained judiciary the grave responsibility of determining, as a question of law, whether the testimony establishes more."

[8] Mrs. Ethel Parks testified that she was over at the Jackson home 2 or 3 days after Boyd and Owens were there, and evidently after the lease was executed, and that Jackson came into the house, and said to his sister:

"Martha, they have done the best they could for me. I didn't think they had, but I know they have. They told me this morning they didn't know there was a drop of oil in the well when they leased my land and they told me this morning they did the best they could for me."

Evidently this testimony was not admissible to show undue influence or for any purpose in this case, except possibly to show the mental condition of Jackson, which is settled by the jury.

We conclude that we cannot disturb the judgment by reason of the action of the trial court in instructing a verdict for the defendant Boyd.

It will be remembered that the jury found that, when David Jackson executed the oil and gas lease, he was of unsound mind, and that at said time he did not know the condition of the K. M. A. well; but they further found that Owens did not make any material misrepresentations to Jackson as to the condition of the K. M. A. well prior to the execution of the lease. There is no finding that appellee Owens knew prior to and at the time of the execution of this lease that Jackson was of unsound mind, nor is there any evidence tending to show that Owens knew of such fact. Owens testified that he had never had any business with Jackson prior to October 19, 1919, and did not know that he was of unsound mind. There is no request by appellants shown in the record to have submitted to the jury the issue as to whether Owens knew at the time of the transaction that Jackson was of unsound mind. In 14 R. C. L. p. 584, it is said:

"The great weight of authority is, however, to the effect that where a contract with an insane person has been entered into in good faith, without fraud or imposition, for a fair consideration, without notice of the infirmity, and before an adjudication of insanity, and has been executed in whole or in part, it will not be set aside unless the parties can be restored to their original position. Such contracts are enforced against the insane person, not so much because they possess the legal essential of consent as because by means of an apparent contract he has gained an advantage or benefit that cannot be restored, and that therefore it would be inequitable to permit him or those in privity with him to repudiate it."

But in the instant case, plaintiffs below, appellants here, are not claiming a right to the rescission of the contract for fraud, but, in effect, are insisting that the lease be sustained and the defendant be required to pay

to plaintiffs the difference between the amount paid by defendant and the reasonable market value of the lease. Therefore we hold that the judgment below cannot be reversed merely on the ground that the jury found that Jackson was insane at the time of the execution of the lease.

The judgment is affirmed.