## Fitzpatrick's Administrator et al. v. Citizens' Bank & Trust Company.

(Decided October 22, 1929.)

LOW & BRYANT for appellants.

W. T. DAVIS, N. R. PATTERSON, J. H. JEFFRIES and W. E. CABELL for appellee.

OPINION OF THE COURT BY COMMISSIONER HOBSON—Affirming.

Cordelia Fitzpatrick died in June, 1924. Her son Thad Fitzpatrick qualified as her administrator. In February, 1925, the Citizens' Bank & Trust Company brought this action to recover on certain notes executed by her and others as her surety to the trust company. The administrator pleaded, in substance, that each note was without consideration, and that, as the bank knew, Mrs. Fitzpatrick was of unsound mind at the time of each transaction. He further alleged that John Fitzpatrick, her husband, purchased with his own funds eight United States liberty bonds of the value of $8,000, and without his wife's knowledge placed same in a safety deposit box, which he had for many years rented from the trust company, and in which he had kept his valuable papers; that the bonds were registered in the name of Cordelia Fitzpatrick, but had never been delivered to her, and this the

officers of the bank knew; that she was of unsound mind, and, after the bank had been notified by members of her family not to have any dealings with her on account of her mental condition, they permitted her to carry an account in the bank, to overdraw it, and that, in order to pay the overdraft, she, with the consent and assistance of the bank, opened the box, and took therefrom the registered Liberty bonds, exchanged them for coupon bonds, and the bank then sold the coupon bonds and placed the proceeds to her credit, and she checked out and used the money; that all of this occurred, as the bank knew, while she was of unsound mind and incapable of comprehending or of understanding the nature or effect of her acts. These facts were pleaded as a set-off and judgment prayed for $8,000, the value of the bonds. The husband, John Fitzpatrick, who was her surety on one of the notes, filed answer, adopting as his answer all of the allegations of the answer of the administrator, and praying judgment for the value of the bonds and his cost. The issues were made up; a jury was waived; the laws and facts were submitted to the court, who gave judgment for the plaintiff. The administrator and the husband of Cordelia Fitzpatrick appeal.

The court's findings of facts are as follows:

"Cordelia Colson Fitzpatrick, the mother of Thad Fitzpatrick and wife of John G. Fitzpatrick, party defendant herein, died in Bell County, Kentucky, on June 21st, 1924. For several years prior to her death she had suffered from mental disturbances called by the medical profession, paranoia. In 1920 she was confined approximately four weeks in a private sanitorium where mental diseases are treated. She returned to her home in Middlesboro about October 23, 1920, and from that time on she was more or less obsessed with the idea that she had been called by the Lord to do certain things and she communicated this definite command to various members of her family and friends. Aside from her religious obsession she could transact all of her household and business affairs and communicate with her family and neighbors as a normal person; she could and did visit her relatives and friends in various neighborhoods in and around her home at Middlesboro, Kentucky; she could drive her own automobile and see that accessories and supplies and

fuel therefor were furnished in adequate quantities and for the usual and customary prices; she could deal with various merchants and purchase goods and knew the kind and quality and the price thereof; she ran a charge account at various stores in Middlesboro, Kentucky, and knew the character and quantity of goods that she desired to purchase, the nature and extent of her account and from time to time made such purchases and paid her account as any other normal person would do.

"For many years prior to December, 1921, she had an open account at the plaintiff bank and checked on said account and made deposits therein in the usual and ordinary manner. Subsequent to 1921, she kept and maintained an open account at the National Bank of Middlesboro, and made many deposits and issued many checks and up to within a few months prior to her death and between the time that her account at the plaintiff bank had closed and during the time that her account was kept at the National Bank of Middlesboro, she had checked out several thousand dollars, and during that time she continued to purchase various articles, drive her automobile around the neighborhood and visit her relatives and friends in adjoining neighborhoods.

"In 1902 John G. Fitzpatrick procured from the plaintiff bank a safety deposit box No. 6, which box was kept and maintained in the bank until the death of Cordelia Fitzpatrick in 1924. There was no rent paid on the safety deposit box until 1919, when Cordelia Fitzpatrick paid the rent on the box to the bank, and possibly paid it for some subsequent years, although the proof is not clear. It appears that the safety deposit box had two keys called 'Customers Keys,' and that in order to open the box it was necessary to use a key kept and controlled by the plaintiff bank called the 'Master Key.' During the years 1919, 1920 and 1921, at various and sundry times Cordelia Fitzpatrick visited the box and kept and maintained therein certain private papers and that during all of the times from the original renting of the box up to December, 1921, John G. Fitzpatrick also had private and personal papers in the box. The possession of one of the customers keys to the box by Cordelia Fitzpatrick was not brought about in any way by the acts of the plaintiff bank, and it is

unexplained in the record how she actually did come into possession of the key. From time to time during the years 1919, 1920 and 1921, as she would visit the box, the employes of the bank would take the master key and use it in unlocking the box to the extent that Cordelia Fitzpatrick could then take the customers key in her possession and complete the process of opening the box, and that none of the employes of the bank knew of the contents of the box or her papers or anything in it.

"About October, 1920, John G. Fitzpatrick purchased and registered in the name of Cordelia Fitzpatrick certain government bonds. The title to said bonds and the ownership thereof were in Cordelia Fitzpatrick. The court finds from common knowledge, but without proof in the record, that the interest on said bonds would be paid by a federal check payable to Cordelia Fitzpatrick, although in this connection there is no evidence that such interest was ever paid or collected by her, nor is it shown that it was ever paid to or collected by any one else. In July, August and September, 1921, Cordelia Fitzpatrick procured the services of the bank in having said bonds converted from registered bonds to coupon bonds and procured the services of said bank in selling said converted coupon bonds, the proceeds of which were applied to her checking account. In rendering this service the bank made no profit or charge and only rendered the usual and customary service that it was then rendering to numerous other customers at said bank. At the time the bonds were converted and the proceeds applied to the checking account of Cordelia Fitzpatrick, she was then overdrawn at the bank approximately $900.00, which was paid out of the proceeds of the bonds, and at the time she was indebted to the bank for certain notes mentioned in the evidence, which were past due, but which were not charged off.

"At the time the bonds were sold at the instance and request of Cordelia Fitzpatrick the bank had no notice of any mental incapacity on the part of Cordelia Fitzpatrick to carry on and transact her personal affairs and business and further finds that at no time during the life of Cordelia Fitzpatrick was there any inquest or adjudication of any court finding her mentally incompetent to transact her busi-

ness affairs. At all times when she was transacting her business affairs at the plaintiff bank, of whatever nature herein found, she was likewise transacting business with other persons and by the consent and knowledge of her family, traveling in different portions of the neighborhoods around Middlesboro and visiting her friends and relatives, driving her own automobile without restraint or remonstrance on the part of her friends and relatives, and the court further finds that various reputable merchants in the neighborhood in which she lived were transacting business with her, selling and collecting for goods furnished to her, and that she could purchase such goods with precision and discrimination without evidence of recklessness, carelessness or waste.

"Cordelia Fitzpatrick had inherited a large estate, approximately $70.000. She was a woman of strong mind and forceful inclination, of an intense religious nature, and quite benevolent towards all persons, particularly her family and members thereof who had been unfortunate. In all her dealings with the plaintiff bank, there is no intimation in the proof that she was overreached or persuaded or counseled to make any disposition of her property, and there was no profit or emolument going to the bank other than to collect its legitimate interest charges in the usual and ordinary way."

The rule is well settled in this court that, where the law and the facts in a common-law action are submitted to the court without the intervention of a jury, the court's finding is equivalent to the verdict of a properly instructed jury, and will not be reversed, unless palpably against the evidence. Bell v. Wood, 87 Ky. 56, 7 S. W. 550, 9 Ky. Law Rep. 917; Kahn v. Rogers, 44 S. W. 431, 19 Ky. Law Rep. 1806; Jolly's Adm'r v. First National Bank, 158 Ky. 505, 165 S. W. 677; Inter-Southern Life Ins. Co. v. Cooke, 183 Ky. 109, 209 S. W. 45.

It is earnestly insisted for appellant that under the proof as to the mental condition of Cordelia Fitzpatrick the court should not have enforced the notes sued on. In 32 C. J. p. 734, sec. 510, after a statement of the rule in some jurisdictions, this is added:

"According to the weight of authority, however, where there has been no inquisition or adjudication of insanity, a contract, entered into upon an ade-

quate consideration of which the insane person has had the benefit, and made by the other contracting party in good faith, without fraud or undue influence, and without knowledge of the insanity or reason to suspect it, will be upheld against the insane person or his representatives, and it cannot be avoided by them where the parties cannot be put in statu quo.'' To the same effect see Rath v. Smith, 180 Ky. 326, 202 S. W. 501, and cases cited.

A careful reading of the record satisfies the court that the case falls clearly within this rule.

It is also earnestly insisted that there was no delivery by the husband to the wife of the eight United States bonds. But it is well settled that a delivery may be either actual or constructive. 28 C. J. p. 638, sec. 25; Reynolds v. Thompson, 161 Ky. 772, 171 S. W. 379; Kelley, etc., Co. v. Goldenberg, 207 Ky. 695, 270 S. W. 15. It is shown by the proof that no rent was paid on this box until 1919, and that Mrs. Fitzpatrick paid the rent for 1919, 1920, and 1921. She made regular visits to the bank, bringing the key with her, and went into the box from time to time. She kept her papers, and, while the husband testifies that in 1920 he took the keys to the box and locked them up in his safe at the garage at his home, he does not explain how his wife thereafter had the key as she had had it theretofore, and the facts shown clearly indicate that he knew she had the key, for when he missed the bonds out of the box he made no complaint so far as appears. She alone could negotiate or use them. She alone could collect the coupons as they matured. He knew this, and plainly, when he put them in the envelope and wrote her name across that envelope and put them in the box where she kept her private papers, he intended this as a delivery of the bonds to her, for he stood by and made no effort to collect the coupons afterwards. If the question of insanity had never come up, can it be believed that he would ever have conceived the idea that these bonds belonged to him? She cannot now tell her side of the story, and that she thought these were her bonds is clear from her conduct. Wrongdoing is not to be presumed of her.

The bank was not guilty of negligence in permitting Mrs. Fitzpatrick to open the safety deposit box when she came there with the key and was the person who was paying the rent. The bank simply treated Mrs. Fitzpatrick

as other people in the community in like circumstances were then treating her.

The notes were payable on demand, and the court entered judgment on the notes with interest from date as prayed in the petition. It is earnestly insisted that no interest ran on the notes until demand was made for their payment, but the notes on their face expressly waived demand, and so no demand was necessary. It is true this provision in the notes was not set out in the petition, but this defect in the petition was cured by the trial on the merits, the special findings, and judgment. C. & O. R. R. v. Williams, 156 Ky. 116, 160 S. W. 769, 49 L. R. A. (N. S.) 347.

Lastly, it is insisted that, as she had money on deposit when the notes matured, and did not apply the money to the payment of the notes, her surety was released. But the notes expressly provided that the bank might not do this, and so the surety cannot complain that the money was not so applied. While this provision of the notes was not pleaded in the petition, this defect in the petition was cured by the trial on the merits.

Judgment affirmed.