### MOTTER, Collector of Internal Revenue, v. PATTERSON.
### No. 705.

Circuit Court of Appeals, Tenth Circuit.
Dec. 18, 1933.

John A. McCann, of Pittsburgh, Pa. (Sardius M. Brewster, U. S. Atty., and L. E. Wyman, Asst. U. S. Atty., both of Topeka, Kan., and C. M. Charest, A. T. Clark, and Eldon O. Hanson, all of Washington, D. C., on the brief), for appellant.

Charles G. Yankey, of Wichita, Kan., and H. M. Langworthy, of Kansas City, Mo. (Albert F. Hillix, of Kansas City, Mo., on the brief), for appellee.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

A tax of $108,261.01 was levied against F. H. Patterson as transferee of Fredonia Portland Cement Company, a New Jersey corporation, under section 280 of the Revenue Act of 1926 (26 USCA § 1069 and note). He paid it under protest and applied for its refund. The application was denied. He instituted this action to recover the sum thus exacted and to review the determination of the Commissioner in refusing to allow as a deduction certain losses asserted to have resulted from the sale of capital stock of Rea-Patterson Milling Company. Patterson died pending appeal, and the action was revived in the name of Daisy Patterson, executrix.

A jury was waived in writing, and the case was submitted to the court. In a written opinion and in formal findings of fact contained in the judgment, the court found specifically that Fredonia Portland Cement Company did not make a sale of its corporate assets; also that the Commissioner improperly refused to allow the deduction claimed on account of losses sustained in connection with the sale of stock of Rea-Patterson Milling Company. Judgment was rendered for plaintiff.

The collector concedes that the court's determination of the second question was correct and both parties concede that the single question now presented for decision is whether Fredonia Portland Cement Company made a sale of its corporate assets during the year 1925.

The collector brings forward at the outset the contention that the assessment is presumptively correct. We agree with that view. United States v. Anderson, 269 U. S. 422, 46 S. Ct. 131, 70 L. Ed. 347; Niles Bement Pond Co. v. United States, 281 U. S. 357, 50 S. Ct. 251, 74 L. Ed. 901. But that presumption is a rebuttable one which may be overcome by evidence. Walls v. Commissioner (C. C. A. 10) 60 F.(2d) 347; Pittsburgh Hotels Co. v. Commissioner (C. C. A. 3) 43 F.(2d) 345; Lunsford v. Commissioner (C. C. A. 6) 62 F.(2d) 740. The Commissioner necessarily found that there was a sale. The trial court found contrariwise; the definite finding being that the corporation made no sale of its corporate assets. Plaintiff urges that the decisive fact thus found is supported by substantial evidence and consequently the judgment should be affirmed. A finding of fact made by the trial court in a case at law in which trial by jury has been waived is not reviewable on appeal if it is supported by substantial evidence. Harrison v. United States (C. C. A. 10) 42 F.(2d) 736. There is little conflict in the evidence. It is almost without dispute or contradiction. The precise question involved is the legal effect of the evidence to support the finding rather than its substantiality; hence we review it briefly.

Fredonia Portland Cement Company, a New Jersey corporation, operated a cement factory at Fredonia, Kan. F. H. Patterson and members of his immediate family owned all of its capital stock, consisting of 2,820 shares, except one share, which was issued to F. C. Doggett, a qualifying director, and it had been reassigned to Patterson. The other members of the family were subservient to Patterson with respect to conducting the business of the corporation. Patterson, during the month of June, 1925, decided to dispose of the business and property. He wished to avoid the double tax which would

be incurred if the corporation sold its corporate assets and distributed the proceeds among the shareholders of stock. With that desire in mind and before beginning negotiations, he consulted a firm of auditors that had done work for him during several years and was advised to sell the corporate stock of the company, not its corporate assets. Two illustration returns were prepared showing the difference in tax between the two methods. He subsequently entered into a contract with Robert L. Cochrane, dated June 23, 1925, for the sale of the entire capital stock at the agreed purchase price of $1,200,000. Wiles conducted the negotiations on behalf of the purchaser. The contract was prepared by an attorney in Chicago named Barnes. Patterson advised all parties during the negotiations and while the contract was in process of preparation that, on account of the income tax feature, he desired to sell the capital stock, not the corporate assets. Barnes advised him that the tax would be the same if the corporation were dissolved, its assets distributed, and the distributees then made conveyance of the physical property. Patterson, unwilling to act upon that advice, sought and obtained an opinion from Arthur Anderson, a public accountant of high standing in Chicago, at a cost of $1,500. His opinion was given to Wiles and by him conveyed to Patterson. It coincided with that of the attorney preparing the contract. After such careful investigation and being thus advised, Patterson executed the contract. It accorded Cochrane the option to purchase the assets instead of the stock. That option was to be exercised by the purchaser giving the seller written notice mailed to him at Fredonia within three days after the execution of the contract. It was never exercised in that manner. Wiles telephoned Patterson that it was desired to purchase the plant instead of the stock, but the record fails to indicate that he suggested a corporate conveyance. There is nothing in the record tending to show that anything was said which would conflict with Patterson's declared intention to dissolve the corporation, distribute its assets, and have the stockholders make conveyance if the purchaser exercised the privilege of acquiring the property instead of the stock. The corporation was not a party to the contract. It was exclusively between Patterson and Cochrane as individuals.

Patterson fell seriously ill with prostate complication and went to St. Louis, where he subsequently underwent two major operations. While there he wrote Doggett, secretary of the company, directing the manner in which the transaction was to be handled, and telling him that, in the event the purchaser desired the assets, to cause a dissolution of the corporation, a distribution of its assets, and conveyance by the stockholders to the purchaser; he further instructed Doggett to engage a firm of tax attorneys at Kansas City for the purpose of effecting the details in the manner desired, that is to say, in the manner provided in the contract, but Doggett failed to do so. In violation of the understanding with respect to the manner of making the sale, and despite the definite instructions given Doggett, an attorney for the purchaser, prepared conveyances from the corporation to Fredonia Portland Cement Company, a Delaware corporation, obviously formed to accept title in lieu of Cochrane, also minutes of a stockholders' meeting and of a directors' meeting authorizing such conveyances. Wiles and the attorney for the purchaser both advised Doggett that the documents were in conformity with the contract, and he believed their statements. He thereupon signed the purported minutes and secured the signature of Mrs. Patterson and that of her daughter at their residence. They did not read the minutes. Doggett merely told them that they were a part of the transaction in disposing of the stock and property. Such minutes, both stockholders' and directors', recite that Patterson was present in Fredonia and acted as chairman. He was in St. Louis at the time. No such meetings were held, and no resolutions authorizing disposition of the corporate assets were adopted. The facts recited were untrue.

Cooper, attorney for the cement company at Fredonia, had not read the contract, but Patterson told him before leaving for St. Louis that the sale was to be effected in the manner to incur the least tax. Cooper read the letter from Patterson to Doggett, and he believed that the contract was being carried out, also that the attorneys suggested in the letter were being consulted. With that understanding, he took the minutes and conveyances to St. Louis to be signed by Patterson. Doggett had already signed them. Patterson was in the operating room undergoing a serious and extremely painful operation at the time Cooper arrived at his room; within fifteen or twenty minutes he was brought into the room on a stretcher, suffering intensely and under the influence of drugs. Cooper told him the papers were for the transfer of the property. He signed them while in bed, without reading them and without knowing their contents. Their execution was merely a matter of form. They were subse-

quently delivered and the check covering the purchase price was made payable to the corporation. Doggett, as secretary, immediately indorsed it, and the money was deposited to Patterson's credit in the bank. It never was covered into the treasury of the corporation. Patterson made trips to Florida, California, Minnesota, and the Hawaiian Islands in the interest of his health. On account of such absence, he did not learn until late in November or early in December, following his operation in July, that in consummating the transaction his desires had not been effected and his instructions had been violated. A meeting of the stockholders was called and held immediately, at which a resolution was adopted reciting that the pretended previous meeting was never held and that all acts done under such pretended authority were null and void. Cochrane was notified of such action, and a tender of conveyances from the stockholders was made. He failed to respond.

 The contract was one in which Patterson agreed to sell the corporate stock, subject to the option of the purchaser, upon written notice within three days after the agreement was executed to have the physical assets of the corporation conveyed. It was perfectly competent for him thus to bind himself to convey and deliver or cause to be conveyed and delivered the stock or assets of the corporation at a future date. Had he failed to comply with the terms of the contract, impossibility of performance would not have been a defense against an action for breach of the contract. Paine v. Parkhurst (C. C. A. 6) 205 F. 740. It was a valid agreement on his part, and there is no suggestion that he was unable to perform it. It is equally certain that the instruments of conveyances were in pursuance of that contract. The purchaser, with full knowledge of the facts, undertook to bring about another method of performance. And that method was squarely contrary to Patterson's desire and determination. He diligently sought to avoid it. He expressed such desire and determination during the negotiations and while the contract was being prepared. In connection therewith, he received counsel and advice from the attorney preparing the contract and the accountant in Chicago. These facts were known to the purchaser. Although Cochrane was the purchaser named in the contract, he and the corporation formed to take title in his stead were in privity. It cannot disclaim knowledge of the agreement or the circumstances under which it was executed. There is no substance upon which to conclude that Pat-

terson changed his attitude and assented to the method he had consistently endeavored to avoid. He never consented to the change; he never agreed that the corporation should convey its assets; he did not know that the instruments were corporate conveyances. He learned the facts about four months later; he then acted promptly by convening the stockholders, adopting a resolution canceling the deeds and tendering conveyances from the stockholders in conformity with his understanding and purpose which had been known to the purchaser since before the contract was executed. The tax necessarily rests upon the assumption that the action of the corporation was a valid transaction made intelligently by those who acted for it. The assumption is false. The stockholders, directors, and officers, including Patterson, the dominant and controlling officer, as such, never agreed to it. That is the actuality of the situation. That the minds of contracting parties must meet and agree on all material features of a contract in order to constitute a binding and enforceable agreement is too well recognized to merit the citation of authorities. That there must be mutual assent is fundamental in the law of contracts. It did not exist in this instance. This court is committed definitely to the doctrine that substance, not form, governs in matters relating to income tax. Howbert v. Penrose, 38 F. (2d) 577, 68 A. L. R. 820; Commissioner v. Moore, 48 F.(2d) 526; Golden Cycle Corporation v. Commissioner, 51 F.(2d) 927; Tulsa Tribune Co. v. Commissioner, 58 F. (2d) 937; Prairie Oil & Gas Co. v. Motter (C. C. A.) 66 F.(2d) 309.

██ It is urged that Patterson will not be heard to avoid an executed contract by setting up the fact that the action was unauthorized or that the conveyance was ultra vires; in other words, that he is estopped to assert that there was no valid sale of the corporate assets. An essential element of estoppel is that the party against whom it is asserted has acted with respect to property, contract, or remedy in such manner that another, acting in good faith and relying thereon, has been led to change his position and would suffer if the true facts were established and should prevail. The collector is not in that position. He cannot be prejudiced by the establishment of the facts. He is not entitled to the tax levied against Patterson as transferee unless a bona fide sale of the corporate assets was made. He has not acted to his detriment on the strength of the apparent sale.

The case of Arizona v. Cooper Queen

Mining Co., 233 U. S. 87, 34 S. Ct. 546, 549, 58 L. Ed. 863, was one for the collection of a tax. The territory contended that the corporation was estopped to deny the lien. The court disagreed with that contention, using this language to express its views:

"In such a proceeding it is difficult to see how the principles of estoppel because of the description of the land made by the owner in returning the property or the payment of taxes, as appears from the finding in this case, could have application. Estoppel ordinarily proceeds upon principles which prevent one from denying the truth of statements upon which others have acted, where the denial would have the effect to mislead them to their prejudice. In this case the territory is undertaking to collect its revenues by certain statutory proceedings duly provided for that purpose, and it would seem to be elementary that such enforcement of collection must depend upon a valid assessment as its basis, and this again was the holding in Missouri."

So here, the right to the tax depends exclusively upon whether the corporation made a bona fide sale of its corporate assets. If so, the tax is due; if not, there can be no tax. The truth cannot prejudice the collector because he has not acted to his detriment.

It is unnecessary to express an opinion with respect to the facts constituting a sale of corporate stock, or the rights of parties in other proceedings. Those questions are not before us. It is enough to say that upon the considerations stated the transaction fails to justify the imposition of the tax in question.

The judgment, rendered on December 21, 1931, provides that it shall bear interest according to law from February 21, 1929. The lawful rate at that time was 6 per cent. per annum. It is suggested that section 319 of the Act of June 30, 1932 (47 Stat. 412), commonly called the Economy Act, reduced the applicable rate to 4 per cent. Section 2 of title 2 of the Act, approved January 30, 1933 (47 Stat. 780, 786), provides that section 319 shall not be applicable to a judgment rendered prior to July 1, 1932, and section 14 of title 2 of the Act approved March 3, 1933 (47 Stat. 1489, 1517 [26 USCA § 2614 note]), repeals the statute entirely and expressly restores the rate applicable prior to June 30, 1932, thus eliminating the question of interest from the case. It should be said in fairness to counsel that the brief presenting the matter was filed prior to the enactment of the two acts last mentioned.

The judgment is affirmed.

PHILLIPS, Circuit Judge (dissenting).

The Fredonia Cement Company of New Jersey will be referred to herein as the New Jersey Corporation, and the Fredonia Cement Company of Delaware as the Delaware Corporation.

Where two methods are available by which a transfer of corporate property may be effected, one of which results in taxable gain to the corporation and one does not, and the property is transferred, the question of whether a tax liability is incurred by the corporation must be determined from the method it actually employed rather than the method it intended should be employed. United States v. Phellis, 257 U. S. 156, 172, 42 S. Ct. 63, 66 L. Ed. 180; Weiss v. Stearn, 265 U. S. 242, 254, 44 S. Ct. 490, 492, 68 L. Ed. 1001, 33 A. L. R. 520; Clemmons v. Commissioner (C. C. A. 5) 54 F.(2d) 209, 211.

In Weiss v. Stearn, supra, the court said:

"Questions of taxation must be determined by viewing what was actually done, rather than the declared purpose of the participants."

And in Clemmons v. Commissioner, supra, the court said:

"It is true that in tax matters the courts must regard the substance rather than the mere form of the transaction; but effect must be given to what persons have done rather than what they say they intended."

Here two methods were open, one a distribution of the assets of the New Jersey Corporation to its stockholders and a transfer by them to the Delaware Corporation, under which no taxable gain would have been realized by the New Jersey Corporation; and the other a direct sale and transfer by the New Jersey Corporation to the Delaware Corporation.

Although Patterson, president of the New Jersey Corporation, testified that he intended to have the former method followed, it is plain that such method was not employed. Clearly, there was no distribution of the physical assets of the New Jersey Corporation to its stockholders, and no transfer by them to the Delaware Corporation.

There was either a sale by the New Jersey Corporation directly to the Delaware Corporation, or no sale at all. The title either passed directly from the New Jersey Corporation to the Delaware Corporation or it still remains in the former or its directors as trustees after its dissolution. See note 1.

Note 1.
"Upon the dissolution in any manner of any corporation, the directors shall be trustees thereof, with

Was there a sale and transfer by the New Jersey Corporation? The corporate records of the New Jersey Corporation recite that a meeting of its stockholders was held on July 3, 1925; that a waiver of notice of such meeting was signed by all of its stockholders. They also recite that at such meeting a resolution was adopted by unanimous vote of all the stockholders authorizing: (1) The officers of the New Jersey Corporation to sell all its physical properties and to make, execute, and deliver any and all deeds of conveyance, bills of sale, contracts, or other instruments necessary to effect such sale; (2) its secretary to attest such instruments and affix the corporate seal thereto; and (3) its *president or vice-president* to fix and determine the price and conditions of sale. (Italics mine.) Following the meeting of the stockholders the directors of the New Jersey Corporation met, executed a written waiver of notice of the meeting, and adopted the same resolution in substance.

On July 9, 1925, Patterson as president executed, and Doggett as secretary attested a deed to certain real estate from the New Jersey Corporation to the Delaware Corporation.

On July 10, 1925, Patterson as president executed, and Doggett as secretary attested a further deed to certain real estate, and a bill of sale of certain personal property, from the New Jersey Corporation to the Delaware Corporation.

The last three mentioned instruments were actually executed by Doggett on July 9 and by Patterson on July 10, 1925.

On July 16, 1925, Patterson as president executed and Doggett as secretary attested a contract between the two corporations by which they agreed to a reduction in the price on account of certain defects in title and other matters. This contract contains the significant recital that "on the 23rd day of June, 1925, a certain contract was entered into between Frank H. Patterson *on behalf of the party of the second part* (the New Jersey Corporation) and Robert L. Cochrane for the

sale and purchase of the physical properties of the party of the second part." (Italics mine.) It also released the New Jersey Corporation and Patterson from any claim for damages on account of any misrepresentations made by Patterson, as an inducement to the contract of June 23, 1926.

The corporate minutes and the instruments of transfer were prepared jointly by Cooper, attorney for the New Jersey Corporation, and Morrison, attorney for the Delaware Corporation. Doggett secured the signatures of the directors and stockholders of the New Jersey Corporation to the waivers of notice and the corporate minutes. Cooper caused the instruments of transfer to be executed by Patterson and Doggett. There is no proof that Morrison had any knowledge of Patterson's secret instructions to Doggett. There is nothing in the contract between Patterson and Cochrane to indicate the method of transfer which Patterson intended should be followed. The blame for the failure to follow Patterson's instructions falls squarely on Doggett and Cooper, and not on the Delaware Corporation or its representatives.

On July 16, 1925, the Delaware Corporation delivered to Doggett as treasurer of the New Jersey Corporation, a check payable to the New Jersey Corporation for the purchase price, less the agreed reduction, and the instruments of transfer were delivered to the Delaware Corporation. It took possession of the properties thereunder, and ever since has been in possession thereof. Doggett as treasurer of the New Jersey Corporation endorsed such check with the corporate name and deposited it to the account of Patterson. Thereafter Patterson distributed the proceeds thereof among the stockholders of the New Jersey Corporation.

On November 24, 1925, the stockholders of the New Jersey Corporation took the necessary legal steps to dissolve that corporation.

On December 2, 1925, the former stockholders of the New Jersey Corporation passed a resolution undertaking to rescind the sale and to distribute the assets of that corporation among its former stockholders, and advised the Delaware Corporation that such stockholders were ready and willing to make proper transfers of the assets of the New Jersey Corporation to the Delaware Corporation.

It was no fault of the Delaware Corporation that the New Jersey Corporation did not retain the proceeds of the sale. It had deliv-

---

full power to settle the affairs, collect the outstanding debts, sell and convey the property and divide the moneys and other property among the stockholders, after paying its debts, as far as such moneys and property shall enable them. They shall have power to meet and act under the by-laws of the corporation, and, under regulations to be made by a majority of said trustees, to prescribe the terms and conditions of the sale of such property, and may sell all or any part for cash, or partly on credit, or take mortgages and bonds for part of the purchase price for all or any part of said property." P. L. N. J. 1896, c. 185, p. 295, § 54, as amended by L. N. J. 1910, c. 36, p. 51, § 1. 2 Comp. St. N. J. 1910, p. 1635, § 54.

ered a check payable to the New Jersey Corporation to its treasurer, the proper officer to receive it. What that officer thereafter did with the check was a matter solely between the officer and his corporation.

## I.

The majority opinion says there was no meeting of the minds of the two corporations on a contract of sale.

Whether there has been a meeting of the minds of the parties on the formation of a contract is determined by applying an objective rather than a subjective test; that is, by ascertaining whether there has been an expressed mutual assent rather than an actual mental assent.

On this question, Mr. Williston in his work on Contracts has this to say:

Sec. 20. "If there has been an expression of mutual assent, the fact that the expression was made under a mistake or induced by fraud, duress, or under undue influence, will not prevent the formation of a contract if there was assent, however induced, to make the expression in question."

Sec. 94. "It follows from the principle that expressed mutual assent rather than actual mental assent is the essential element in the formation of contracts, that a mistaken idea of one or both parties in regard to the meaning of an offer or acceptance will not prevent the formation of a contract. Such a mistake may, under certain circumstances be ground for relief from the enforcement of the contract. But this relief is in its origin equitable and is in its nature a defense to the enforcement of the contract of which advantage may or may not be taken, rather than a defect in the formation of the contract. It follows that the test of the true construction of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant."

Sec. 1536. "Under the guise of conclusive presumptions of mental assent from external acts, the law has been so built up that it can be now expressed accurately only by saying that the elements requisite for the formation of a contract are exclusively external."

In O'Donnell v. Town of Clinton, 145 Mass. 461, 14 N. E. 747, 751, the court said:

"Assent, in the sense of the law, is a matter of overt acts, not of inward unanimity in motives, design, or the interpretation of words."

In Hotchkiss v. National City Bank (D. C. N. Y.) 200 F. 287, 293, the court said:

"A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent."

See, also, Bijur Motor L. Co. v. Eclipse Mach. Co. (C. C. A. 2) 243 F. 600, 603; C. H. Pope & Co. v. Bibb Mfg. Co. (C. C. A. 2) 290 F. 586, 587; Det Forenede Dampskibs-Selskab Aktieselkab v. C. F. & G. W. Eddy (D. C. Mass.) 293 F. 82, 87; Washington Shoe Mfg. Co. v. Duke, 126 Wash. 510, 218 P. 232, 37 A. L. R. 611; Allen v. Bissinger & Co., 62 Utah, 226, 219 P. 539, 31 A. L. R. 376; Davern v. American Mut. Liab. I. Co., 241 N. Y. 318, 150 N. E. 129, 43 A. L. R. 522; Eleftherion v. Great Falls Mfg. Co., 84 N. H. 32, 146 A. 172; McConnell v. Lamontagne, 82 N. H. 423, 134 A. 718; Seavy & Flarsheim Brokerage Co. v. Monarch Peanut Co. (St. Louis Ct. of App.) 241 S. W. 643.

Applying the principle to offer and acceptance, Mr. Williston, at section 35 of his work on Contracts, says:

"Throughout the formation of contracts it is to be observed that not assent, but what the other party is justified as regarding as assent is essential. Accordingly if an offeree in ignorance of the terms of an offer so acts or expresses himself as to justify the other party in inferring assent, and this action or expression was of such a character that a reasonable man in the position of the offeree should have known it was calculated to deceive the offeror into the belief that his offer had been accepted, a contract will be formed in spite of the offeree's ignorance of the terms of the offer. The commonest illustration of this principle is where one is ignorant of the language in which a document is written, or who is illiterate executes, under a mistake as to its contents, a writing proposed as a contract. * * * A similar principle is applicable to the offeror's conduct as to the offeree's. If the offeror prepared the writing and failed therein to express his meaning, he no more than the acceptor could evade its effect."

The rule is stated in Restatement, Contracts § 20, as follows:

"Mutual assent to the formation of informal contracts is operative only to the extent that it is manifested. Moreover, if the

manifestation is at variance with the mental intent, subject to the slight exception stated in Sec. 71, it is the expression which is controlling. Not mutual assent but a manifestation indicating such assent is what the law requires. Nor is it essential that the parties are conscious of the legal relations which their words or acts give rise to. It is essential, however, that the acts manifesting assent shall be done intentionally. That is, there must be a conscious will to do those acts; but it is not material what induces the will. Even insane persons may so act; but a somnambulist could not."

The proffer of the deeds and the bill of sale by the New Jersey Corporation to the Delaware Corporation was an offer. Their receipt, and the payment of the purchase price by the Delaware Corporation, was an acceptance of the offer by it. Thereupon a binding contract was consummated, although one of the officers of the New Jersey Corporation, who executed the instruments, did not understand the import of the offer.

Furthermore the other officers of the New Jersey Corporation, empowered by the corporate action of July 3, 1925, to act in the premises, fully understood the import of such instruments.

Tested by the foregoing principles there was the requisite manifestation of mutual assent to a contract of sale between the two corporations and such contract was fully executed.

The fact that neither the stockholders nor directors actually met and adopted the resolutions above referred to, is not important. They all signed the corporate minutes of the meetings and are bound thereby. Where a contract of sale has been fully executed on the part of the purchaser, who has acted in good faith, the selling corporation is estopped to deny the validity of the sale on account of informalities, irregularities, or illegalities in the corporate meetings authorizing such sale, or in the action of the corporate officers. This is especially true where the selling corporation cannot restore the status quo ante. Fletcher Cyc. Corporations (Perm. Ed.) § 430; Morris v. Y. and B. Corporation, 198 N. C. 705, 153 S. E. 327; Painter v. Brainard-Cedar Realty Co., 29 Ohio App. 123, 163 N. E. 57; Colcord v. Granzow, 137 Okl. 194, 278 P. 654; Defanti v. Allen Clark Co., 45 Nev. 120, 198 P. 549; Ashley Wire Co. v. Illinois Steel Co., 164 Ill. 149, 45 N. E. 410, 56 Am. St. Rep. 187.

## II.

There was evidence that Patterson, at the time he executed the deeds and the bill of sale, because of illness, was temporarily incapable of comprehending the import thereof. It was not shown that he was so incapacitated when he signed the corporate minutes of July 3, 1925, and the contract of July 16, 1925.

Assuming, but not admitting, that Patterson's mental condition affected the contract of sale between the two corporations, it at most rendered the contract voidable.

The contract of an insane person, who has not been so adjudged, is voidable but not void. Ash v. Wulf, 127 Kan. 301, 273 P. 432; Doris v. McFarland, 113 Conn. 594, 156 A. 52; Haddock v. Callahan Grocery Co., 163 Ga. 204, 135 S. E. 747; Dean v. Estate of Atwood (Iowa) 212 N. W. 371; Wadford v. Gillette, 193 N. C. 413, 137 S. E. 314; Feild v. Koonce, 178 Ark. 862, 12 S.W.(2d) 772, 68 A. L. R. 1303; Czyrson v. Roseau County Nat. Bank, 172 Minn. 420, 216 N. W. 224; Cawby v. Kurtz, 209 Ky. 275, 272 S. W. 746. This is the rule in Missouri where the deeds and the bill of sale were delivered and the purchase price paid. Brann v. Missouri State L. I. Co. (Mo. App.) 226 S. W. 48; Hill-Dodge Bank. Co. v. Loomis, 140 Mo. App. 62, 119 S. W. 967.

The contract being voidable merely, no ratification was necessary to give it validity. Caldwell v. Ruddy, 2 Idaho (Hasb.) 1, 1 P. 339; Blinn v. Schwarz, 177 N. Y. 252, 69 N. E. 542, 101 Am. St. Rep. 806. On the other hand, a disaffirmance was necessary in order to nullify the contract. Ætna Life I. Co. v. Sellers, 154 Ind. 370, 56 N. E. 97, 77 Am. St. Rep. 481; Skinner v. Schwab, 188 App. Div. 457, 177 N. Y. S. 143.

The action which the former stockholders attempted to take on December 2, 1925, was wholly ineffectual. The power to act was in the directors as successor trustees, not in the former stockholders. See note 1, supra.

Where a contract has been entered into with an insane person not so judicially adjudicated, upon an adequate consideration, and the other party has entered into the contract in good faith without knowledge of or reason to suspect such insanity, and no undue influence or fraud has been practiced on the insane person, and he has received and enjoyed the full benefit of the contract and is unable to place the other party in statu quo, neither the insane person nor

his representatives can avoid the contract. Doty v. Mumma, 305 Mo. 188, 264 S. W. 656, 657, 34 A. L. R. 1399; Flach v. Gottschalk Co., 88 Md. 368, 41 A. 908, 42 L. R. A. 745, 71 Am. St. Rep. 418; Rhoades v. Fuller, 139 Mo. 179, 40 S. W. 760, 762; Gwinn v. Hobbs, 83 Ind. App. 263, 141 N. E. 812, 817, 144 N. E. 648; Dowlin v. Boyd (Tex. Civ. App.) 284 S. W. 636, 641; Fitzpatrick's Adm'r v. Citizens' Bank & T. Co., 231 Ky. 202, 21 S.W.(2d) 254, 257; Scott v. Hay, 90 Minn. 304, 97 N. W. 106, 109; Wadford v. Gillette, supra; Czyrson v. Roseau County Nat. Bank, supra; Molton v. Camroux, 2 Exch. 487, 502, 154 Reprint 584; 32 C. J. p. 733.

The Delaware Corporation had neither knowledge nor reason to suspect that Patterson did not read and understand the import of the deeds and the bill of sale. Acting in good faith, it paid the purchase price, accepted the deeds and the bill of sale, went into possession of the property thereunder, and has since operated the plant. The contract has been fully executed. The New Jersey Corporation has received the benefits thereof, has distributed its assets to its stockholders, and has effected its dissolution. Neither it, its directors as trustees, nor its former stockholders can now place the Delaware Corporation in statu quo, and the contract may not now be avoided.

### III.

A person by the acceptance of benefits may be estopped to deny the existence, validity, and effect of a contract. Ford v. Ford, 24 S. D. 644, 124 N. W. 1108; Adamstown C. & S. Co. v. Baltimore & O. R. Co., 137 Md. 199, 112 A. 286, 289; 21 C. J. § 211, p. 1209.

The New Jersey Corporation received the benefits of the contract and in turn transferred them to Patterson, who here asserts the non-existence of the contract. Patterson by distributing the purchase price to himself and the other stockholders, and by joining in the dissolution of the corporation, has disabled the corporation from returning such benefits. After acquiring full knowledge of the facts, neither the New Jersey Corporation, its directors as successor trustees, nor its former stockholders tendered back the benefits received from the sale. Under these circumstances that corporation, its directors as successor trustees, its stockholders, and Patterson ratified the transaction, and are estopped to deny the existence and validity of the deeds

and the bill of sale. Warner v. Hill, 153 Ga. 510, 112 S. E. 478, 480; Johnson v. Milwaukee & W. Inv. Co., 49 Neb. 68, 68 N. W. 383; Ford v. Ford, supra; Adamstown Co. v. Railroad Co., supra; Ormsby v. Johnson, 24 S. D. 494, 124 N. W. 436, 437; Huffaker v. Town of Fairfax, 115 Okl. 73, 242 P. 254, 255; Beasley v. Assets Conservation Co., 131 Wash. 439, 230 P. 411, 413; New Hampshire Land Co. v. Tilton (C. C. N. H.) 19 F. 73, 77; Kansas Life Ins. Co. v. Harroun, 44 Idaho, 643, 258 P. 929, 930; City of Belfast v. Belfast Water Co., 115 Me. 234, 98 A. 738, 740, L. R. A. 1917B, 908; Bacich v. Northland Transp. Co., 185 Minn. 544, 242 N. W. 379, 387; Green v. Lidberg, 181 Minn. 361, 232 N. W. 511; White v. Moales, 147 Miss. 558, 113 So. 341.

### IV.

It is not essential for the government to assert the estoppel. The New Jersey Corporation delivered the deeds and the bill of sale of its property, and received the purchase price therefor. The contract was not void, but at most voidable. The title to the property passed thereunder. Ash v. Wulf, supra; Ætna Life I. Co. v. Sellers, supra. The purchase price represents a profit received by the New Jersey Corporation. It has not returned that purchase price, but has distributed it to its stockholders through Patterson. That is the existing status. The question of estoppel only becomes material in determining whether the New Jersey Corporation or its successor trustees can now change that status. The New Jersey Corporation and its successor trustees have not, and by principles of estoppel cannot now change that status. By accepting and retaining the benefits after acquiring knowledge of the facts, the New Jersey Corporation, and its directors as successor trustees, have ratified and cured any defect in the original contract.

Surely, the New Jersey Corporation may not receive and retain a profit from a transaction and escape a tax thereon by asserting that the transaction in its inception was voidable, when it has not avoided, and by reason of what has since transpired cannot now avoid, the legal import of the transaction.

It is my conclusion that a tax liability has arisen against the New Jersey Corporation, and that Patterson is liable therefor as transferee.

For these reasons I respectfully dissent.